120 P.3d 1115

LIBERTY MUTUAL FIRE INSURANCE COMPANY, Plaintiff–Appellant,

v.

Donald H. DENNISON and Lynn T. Dennison, Individually and as Next Friend of Tyrone Dennison, a minor, Defendants–Appellees.

No. 24975.

Supreme Court of Hawai'i.

Oct. 11, 2005.

Randall Y. Yamamoto and Brian A. Kang (of Watanabe, Ing & Kawashima), Honolulu, on the briefs, for plaintiff-appellant.

Bert S. Sakuda, Gregory L. Lui–Kwan, and Geoffrey K.S. Komeya (of Cronin, Fried, Sekiya, Kekina & Fairbanks), Honolulu, on the briefs, for defendants-appellees.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; ACOBA, J., Dissenting.

Opinion of the Court by MOON, C.J.

This action for declaratory relief arises out of an automobile accident in which then-fifteen year old Tyrone Dennison (Tyrone) suffered severe injuries, including brain damage. The dispute on appeal centers around Tyrone's father, defendant-appellee Donald H. Dennison (Donald) and his separate claim for underinsured motorist (UIM) benefits. Briefly stated, although Donald was not involved in the accident, he claimed emotional distress as a result of seeing his son being attended to by emergency medical personnel at the triage area near the accident scene and eventually taken away by the medi-vac helicopter. Plaintiff-appellant Liberty Mutual Fire Insurance Company [hereinafter, Liberty Mutual] tendered a policy limit payment for UIM benefits [1] to Donald and defendant-appellee Lynn T. Dennison [hereinafter, collectively, the Dennisons] as next friends of Tyrone. Donald also filed a separate claim for UIM benefits based on his emotional distress. Liberty Mutual subsequently filed this declaratory judgment action, requesting the Circuit Court of the First Circuit, the Honorable Richard W. Pollack presiding, to declare that, because Donald was not involved in nor witnessed the accident, he was not entitled to compensation under Hawai'i

---

1. At the time of the accident, Tyrone's parents were the named insureds under a motor vehicle insurance policy issued by Liberty Mutual that included a UIM coverage endorsement of a policy limit of $35,000.00 per accident.

Revised Statutes (HRS) § 431:10C–306(b) (1993)[2] and *First Ins. Co. of Hawai'i v. Lawrence*, 77 Hawai'i 2, 881 P.2d 489, *reconsideration denied*, 77 Hawai'i 373, 884 P.2d 1149 (1994) [hereinafter, *Lawrence* ].[3]

Liberty Mutual appeals from the circuit court's: (1) September 26, 2001 order denying its motion for summary judgment [hereinafter, motion or motion for summary judgment]; and (2) February 5, 2002 judgment in favor of the Dennisons, individually and as next friends of their son, Tyrone. On appeal, Liberty Mutual contends that the circuit court erred in denying its motion and entering judgment in favor of the Dennisons based on its conclusion that Donald was not precluded from filing, under his insurance policy, a separate and independent claim for emotional distress allegedly arising from the instant accident.[4] Liberty Mutual maintains

2. HRS § 431:10C–306(b) (1993), which has since been amended, was in effect at the time of the February 21, 1997 accident and is, therefore, applicable in the instant case. *See* 1987 Haw. Sess. L. Act 347, § 4 at 342; 1997 Haw. Sess. L. Act 251, § 70 at 553. It provided in pertinent part:

> (b) Tort liability is not abolished as to the following persons, their personal representatives, or their legal guardians in the following circumstances:
> (1)(A) Death occurs to such person *in such a motor vehicle accident;*
>     . . . .
> (2) Injury occurs to such person *in a motor vehicle accident* in which the amount paid or accrued exceeds the medical-rehabilitative limit established in section 431:10C–308 for expenses provided in section 431:10C–103(10)(A) and (B); provided that the expenses paid shall be presumed to be reasonable and necessary in establishing the medical-rehabilitative limit; or
> (3) Injury occurs to such person *in such an accident* and as a result of such injury that the aggregate limit of no-fault benefits outlined in section 431:10C–103(10) payable to such person are exhausted.

(Emphases added.)

3. We note that *Lawrence* concerned the then-repealed HRS chapter 294 (1985) because, "[a]lthough Hawai'i's No-Fault Law, HRS chapter 294 (1985) was repealed in 1987, it [was] applicable [in *Lawrence* ] because the recodified chapter HRS chapter 431:10C, became effective after the date of the accident involved in [*Lawrence* ]." *Lawrence*, 77 Hawai'i at 4 n. 3, 881 P.2d at 491 n. 3 (citation omitted). The precise statute at issue in *Lawrence* was HRS § 294–6 (1985), which provided in relevant part:

> **Abolition of tort liability.** (a) Tort liability of the owner, operator, or user of an insured motor vehicle, or the operator or user of an uninsured motor vehicle, or the operator or user of an uninsured motor vehicle who operates or uses such vehicle without reason to believe it to be an uninsured motor vehicle, with respect to accidental harm arising from motor vehicle accidents occurring in this State, is abolished, except as to the following persons or their personal representatives, or legal guardians, and in the following circumstances:
> (1) Death occurs *to such person in such a motor vehicle accident;* or injury occurs to

such person which consists, in whole or in part, in a significant permanent loss of use of a part or function of the body; or injury occurs to *such person* which consists of a permanent and serious disfigurement which results in subjection of the injured person to mental or emotional suffering;
> (2) Injury occurs *to such person in a motor vehicle accident* in which the amount paid or accrued exceeds the medical-rehabilitative limit established in section 294–10(b) for expenses provided in section 294–1(10)(A) and (B); provided that the expenses paid shall be presumed to be reasonable and necessary in establishing the medical-rehabilitative limit; or
> (3) Injury occurs *to such person in such an accident* and as a result of such injury the aggregate limit of no-fault benefits outlined in section 294–2(10) payable to such person are exhausted.

*Id.* at 8, 881 P.2d at 495 (citing HRS § 294–6(a) (1985)) (emphasis in original). However, as previously indicated, we apply the substantively similar HRS § 431:10C–306(b) (1993) *to the instant case.*

4. Specifically, Liberty Mutual contends that the circuit court "erred in denying [its] motion for summary judgment based on its holding that 'direct emotional trauma may be inflicted where the claimant did not witness the injury-producing event at the time it occurred but arrived onto the accident scene shortly thereafter,' and thus, Donald is not 'precluded as a matter of law from asserting an independent claim for emotional distress.' " Regarding the circuit court's judgment, Liberty Mutual argues:

> The [circuit] court erred in entering a judgment in favor of the Dennisons and against Liberty Mutual following the non-jury trial, based on its conclusions that:
> a) Donald "suffered his 'accidental harm' *in* the accident within the meaning of HRS Chapter 431:10C–306(b)" (emphasis in original)
> b) " 'direct emotional trauma' may be inflicted where the claimant did not witness the injury-producing event at the time it occurred but arrived onto the accident scene shortly thereafter"; and
> c) "[Donald] is not precluded from asserting a separate [UIM] policy limit under the applicable policy for his emotional distress claim."

that, because Donald was neither involved in the car accident nor witnessed the accident, he is precluded from recovering for any emotional distress under HRS § 431:10C–306(b) and *Lawrence,* 77 Hawai'i 2, 881 P.2d 489.

As discussed more fully *infra* in section III, we vacate the circuit court's September 26, 2001 order and February 5, 2002 judgment and remand this case for entry of judgment in favor of Liberty Mutual.

## I. *BACKGROUND*

### A. *Factual Background*

The parties stipulated to the following statement of facts:

1. At approximately 1:06 a.m. on Friday, February 21, 1997, [Tyrone] was a passenger in a 1992 Toyota Corolla driven by nineteen year old Michael Lutz.

2. [Lutz] had a blood alcohol level of .09 percent and had lost control of the Toyota Corolla which crashed into a utility pole on Kuloa Avenue in Kapolei.

3. [Tyrone], the son of [the Dennisons], was fifteen years old at the time (DOB January 19, 1982).

4. [Tyrone] suffered severe injuries, including brain damage and jaw injuries in the collision.

5. [Tyrone] was found unconscious and in critical condition in the back seat of the Lutz vehicle.

6. [The Dennisons] were not in the Lutz car when the collision occurred and they did not witness the actual collision.

7. At about 1:30 a.m., police officer Joseph Tabarejo, one of the investigating officers, went to the Dennison home and told [the Dennisons] that Tyrone was in an accident and that they were going to medevac him.

8. At that time, [Donald] had already heard a helicopter overhead.

9. Prior to notification by officer Tabarejo, [Donald] was not aware that his son had been involved or injured in an accident.

10. Immediately after speaking with officer Tabarejo, [Donald] did not hesitate, and he ran out the side door of his garage, jumped a wall behind his house and ran to the triage area where the ambulance and firemen had congregated which was down the street from the site of the collision. [Donald] estimated that the distance from the wall behind his house to the ambulance may have been about the length of a football field.

11. [Donald] looked closely at two boys who were on gurneys. Neither was his son Tyrone. Both boys were conscious, and nothing seemed to be wrong with them. After he saw those two boys, [Donald] knew that the medevac helicopter was for his son.

12. [Donald] proceeded toward the ambulance at the scene and looked inside.

13. Medical technicians and a fireman were in the ambulance intubating a patient, i.e. placing a mask attached to a manual pump, over the patient's nose and mouth.

14. The patient's face was partially covered, so [Donald] could not recognize his son.

15. One of the medical technicians asked [Donald] "who you looking for?" [Donald] said "my son." The attendant said "what, the kid with the tattoo?" [Donald] said "yeah" and the medical technician said "that's him there[ ]", referring to the individual the medical technicians were working on.

16. [Tyrone] was unconscious and completely unresponsive.

17. [Donald] knew that his son's condition was serious when he saw the medical technicians intubating Tyrone. He wondered how long his son had not been breathing and how long his brain had been deprived of oxygen.

18. [Donald] asked if Tyrone was going to make it and no one would give him an answer. The medical technicians just told [Donald] that they were going to fly [Tyrone] to Queen's Medical Center and that he should go there.

(Emphasis in original.)

19. The medical technicians then took Tyrone out of the ambulance and wheeled him by gurney to the helicopter which was waiting. [Donald] could see blood on his son's face.

20. As [Tyrone] was being taken to the medevac helicopter, [Donald] told him to "hang on" and "I love you".

21. [Donald] ran back to his house and told his wife what happened. [Donald] then broke down and cried.

22. [The Dennisons] then went to the hospital and were told that Tyrone was in critical condition. [Tyrone] was in a coma, which lasted approximately two months.

23. After the accident, [Donald] underwent individual and group counseling on the mainland for psychological injuries.

24. Robert C. Marvit, M.D. has also reviewed medical records and examined [Donald] and states in his February 20, 2001 report that "it is [his] opinion with reasonable probability that indeed, [Donald] had suffered a significant, severe, mental and emotional distress of this automobile accident and his coming upon the scene in the manner described."

25. At the time of the accident, [the Dennisons] were the named insureds under a motor vehicle insurance policy issued by Liberty Mutual, with a policy period of January 10, 1997 to January 10, 1998, which included an [UIM coverage] endorsement.

26. The insuring agreement for the UIM endorsement provided in pertinent part:

> We will pay damages which an **insured** is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of bodily injury:
>
> 1. Sustained by an **insured;** and
>
> 2. Caused by an accident.
>
> The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the **underinsured motor vehicle.**
>
> We will pay under this coverage only after the limits of liability under any applicable bodily injury liability bonds

or policies have been exhausted by payment of judgments or settlements.

27. The UIM endorsement provided that the [UIM] policy limit was $35,000 per accident, stacked times two vehicle[s], or $70,000.

28. At the time of the underlying accident, [Lutz] was insured by AIG Hawaii ("AIG"), with a bodily injury policy limit of $25,000 per person. On August 30, 1999, AIG, on behalf of [Lutz], tendered the sum of $50,000. One $25,000 policy limit was paid for the injuries to [Tyrone]. A separate policy limit of $25,000 was paid for what AIG characterized as [Donald]'s independent claims.

29. Thereafter, Liberty Mutual tendered a UIM policy limit in the amount of $70,000 to [the Dennisons], as Next of Friend of [Tyrone].

30. [Donald] made a demand for a separate UIM policy limit under Liberty Mutual's policy for his claim of emotional distress.

31. Liberty Mutual refused to pay on a separate UIM policy limit for [Donald]'s claims and filed the above-captioned declaratory judgment action on April 24, 2000.

(Brackets and underscored emphases added.) (Bold emphases in original.)

B. *Procedural Background*

On April 24, 2000, Liberty Mutual filed a complaint for declaratory judgment, wherein it sought "[a] declaration that [Donald] is not entitled to [UIM] benefits under the policy arising out of the underlying accident[.]" On May 17, 2000, the Dennisons filed an answer to the complaint.

On August 14, 2001, Liberty Mutual filed a motion for summary judgment, acknowledging that "the crux of this case is whether [Donald]'s alleged emotional distress is derivative of Tyrone's injuries in the accident." Liberty Mutual contended: "Under the controlling authority of *First Insurance Co. of Hawai'i v. Lawrence*, 77 Hawai'i 2, 881 P.2d 489 (1994), [Donald]'s alleged emotional distress is clearly derivative of Tyrone's injuries, and [Donald] is therefore *not* entitled to

a *separate* UIM policy limit as a matter of law." (Emphases in original.) (Parenthetical notation omitted.) Liberty Mutual also asserted that, "since it is undisputed that [Donald] was not 'in' the motor vehicle accident that injured his son, his claim for [negligent infliction of emotional distress (NIED)] is derivative and he is not entitled to a separate UIM policy limit as a matter of Hawaii motor vehicle insurance law." (Capital letters altered.) On September 7, 2001, the Dennisons filed a memorandum in opposition to Liberty Mutual's motion for summary judgment, arguing that Donald's claim for emotional distress was *not* derivative— *i.e.*, it was separate from and independent of Tyrone's claim—and that, therefore, he was not precluded from recovering UIM benefits from Liberty Mutual.

On September 17, 2001, the circuit court held a hearing on Liberty Mutual's motion. The court entered an order denying Liberty Mutual's motion for summary judgment on September 26, 2001. Therein, the court noted that, under *Lawrence*, " '*direct emotional trauma' may be inflicted where the claimant did not witness the injury-producing event* at the time it occurred but arrived onto the accident scene shortly thereafter." (Emphasis added.) Thus, the court denied Liberty Mutual's motion and ruled that Donald was not precluded from asserting an independent claim for emotional distress.

Following the denial of Liberty Mutual's motion for summary judgment, a bench trial commenced on November 13, 2001. On November 16, 2001, the parties entered into the foregoing stipulated statement of facts. The stipulated statement phrased the issue before the circuit court as follows:

> Whether [Donald] is precluded from making a claim on a separate policy limit of [UIM] coverage for his emotional distress allegedly suffered in the subject February 21, 1997 motor vehicle collision, because [Donald] was not in the motor vehicle with his son [Tyrone] at the time of the collision and did not witness the actual collision itself?
>
> Liberty Mutual and [the Dennisons] agree that the above captioned [d]eclaratory [j]udgment action will not address the

following issues which are reserved for a private [UIM] arbitration under the terms of the Liberty Mutual auto policy issued to [the Dennisons]:

> 1. The extent of damages, if any, to which [Donald] is entitled for his emotional distress claim.
>
> 2. Issues of proximate cause.
>
> 3. Issues of negligence and tort liability of the responsible driver in this single car accident, [Lutz].

On February 5, 2002, the circuit court entered its judgment in favor of the Dennisons and against Liberty Mutual, concluding that "[Donald] is not precluded from asserting a separate [UIM] benefits policy limit under the applicable policy for his emotional distress claim." Liberty Mutual filed its timely notice of appeal on March 7, 2002.

## II. *STANDARDS OF REVIEW*

### A. *Statutory Interpretation*

■ "The standard of review for statutory construction is well-established. The interpretation of a statute is a question of law which this court reviews *de novo*. Where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning." *Labrador v. Liberty Mut. Group*, 103 Hawai'i 206, 211, 81 P.3d 386, 391 (2003) (citations, internal quotation marks, and brackets omitted).

### B. *Conclusions of Law*

■ "We review the circuit court's conclusions of law *de novo*." *Chock v. Gov't Employees Ins. Co.*, 103 Hawai'i 263, 265, 81 P.3d 1178, 1180 (2003) (citing *Troyer v. Adams*, 102 Hawai'i 399, 409–10, 77 P.3d 83, 93–94 (2003)).

## III. *DISCUSSION*

The sole issue in the instant case is:

Whether [Donald] is precluded from making a claim on a separate policy limit of [UIM] coverage for his emotional distress allegedly suffered in the subject February 21, 1997 motor vehicle collision, because [Donald] was not in the motor vehicle with

his son [Tyrone] at the time of the collision and did not witness the actual collision itself?

As the parties suggest, HRS § 431:10C–306(b) and this court's decision in *Lawrence* are dispositive of the issue before this court.

Liberty Mutual contends that, under the plain language of HRS § 431:10C–306(b), *see supra* note 2, "Donald did not sustain his alleged accidental harm 'in' a 'motor vehicle accident'" and, thus, is precluded from recovering UIM benefits for his emotional distress. Liberty Mutual also argues that, pursuant to *Lawrence*, "a claimant is required to 'witness an event that caused injury' in order to assert an independent claim for negligent infliction of emotional distress." (Brackets omitted.) Thus, Liberty Mutual urges that, because Donald did not witness the car accident and arrived at the "triage area" thirty minutes after the accident occurred, Donald is precluded from recovering UIM benefits separate and apart from Tyrone's claim.

In response, the Dennisons assert that the circuit court properly concluded that Donald was not precluded from recovering for his emotional distress inasmuch as "*Lawrence* did not establish a requirement that the actual impact must be observed." (Capital letters altered.) The Dennisons argue that:

> All of the issues raised on this appeal are controlled by [*Lawrence*, 77 Hawai'i 2, 881 P.2d 489]. *Lawrence* held: (1) that emotional distress injuries are allowed under Hawai'i's motor vehicle insurance law; (2) claims for emotional distress experienced by a bystander as a result of injury to another are permitted under Hawaii's motor vehicle insurance law if they arise in the context of motor vehicle accidents; and (3) such *emotional distress injury is independent and entitled to a separate policy limit if there is direct emotional trauma involving a sensory perception of either the accident or the scene shortly thereafter to witness the injured or efforts to revive them.*

(Emphasis added.)

Preliminarily, we note that the Dennisons' assertion emphasized above is merely their

interpretation of the holding in *Lawrence*. No such language exists in that opinion. Moreover, as discussed *infra*, the holding in *Lawrence* does *not* allow for independent UIM claims where the claimant did not witness the event causing injury or death to the host plaintiff.

■ As this court noted in *Lawrence*, the state legislature abolished tort liability for accidental harm arising from motor vehicle accidents such that accident victims are no longer able "to maintain a traditional negligence tort action against an alleged wrongdoer" except in specific circumstances as delineated under HRS § 431:10C–306. 77 Hawai'i at 7–8, 881 P.2d at 494–95 (quoting *Parker v. Nakaoka*, 68 Haw. 557, 560, 722 P.2d 1028, 1030 (1986).) In that regard, HRS § 431:10C–306 does *not* abolish tort liability where, *inter alia*, "[i]njury occurs to such person *in* a motor vehicle accident[.]" (Emphasis added.) As such, "[p]ursuant to the plain and unambiguous language of [HRS § 431:10C–306(b)], persons … may assert a claim for accidental harm [5] as long as the threshold requirements are met—the first being that death or injury occurs 'to such person *in*' a motor vehicle accident." *Lawrence*, 77 Hawai'i at 8, 881 P.2d at 495 (emphasis in original). Although the parties in this case agree that, pursuant to HRS § 431:10C–306(b), Donald may not recover insurance benefits from Liberty Mutual unless he suffered emotional distress "in" the February 21, 1997 car accident, they disagree as to whether Donald was "in" the accident for purposes of HRS § 431:10C–306. Thus, the issue before this court is whether Donald, who was not a passenger in the Lutz car, did not witness the car accident, and arrived "down the street from the site of the collision" approximately thirty minutes after the accident occurred, sustained his emotional distress "in" the car accident for purposes of HRS § 431:10C–306(b) and, therefore, may maintain an independent claim against Liberty Mutual.

---

5. In *Lawrence,* this court held that "the statutory definition of accidental harm includes emotional distress[.]" 77 Hawai'i at 4, 881 P.2d at 491.

In *Lawrence,* 77 Hawai'i at 4, 881 P.2d at 491, this court addressed whether emotional distress claims brought by family members, who were not involved in and did not witness the car accident that killed their relative, are entitled to independent protection under Hawaii's no-fault law. In that case, Christopher Smith, Jr. (Christopher), a pedestrian, was struck and killed by a car being pursued by the police. *Lawrence,* 77 Hawai'i at 5, 881 P.2d at 492. Christopher's parents, wife, and children [hereinafter, collectively, the Smiths] thereafter filed an action claiming NIED against the driver and the driver's parents, who were insured by First Insurance Co. of Hawai'i (First Insurance). *Id.* It was undisputed that "[t]he Smiths were not involved in nor did they witness the accident." *Id.* Thus, First Insurance argued that the Smiths' NIED claims "were derivative and, therefore, subject to a single limit of liability coverage under the policy." *Id.* The circuit court disagreed, ruling that "NIED is an independent tort requiring proof based on ordinary tort principles and exists apart from the underlying tort claimed by the host tort plaintiff." *Id.* (ellipses points, brackets, and internal quotation marks omitted).

On appeal, this court reversed in part the circuit court's order, holding that, "although NIED claims are entitled to independent protection under general Hawai'i tort law, *such claims under Hawai'i's No–Fault Law, HRS chapter [431:10C], are derivative,[6] subject to the exception discussed below*[.]" *Id.* at 4, 881 P.2d at 491 (emphasis added); *see also id.* at 10, 881 P.2d at 497 (noting that "derivative claims ... arising from bodily injuries suffered by one's spouse in an automobile accident ... are not independent to the extent that they may be asserted without regard to the nature or extent of the injuries to the person suffering accidental harm" (citing *Doi v. Hawaiian Ins. & Guar. Co.,* 6 Haw.App. 456, 727 P.2d 884 (1986) (emphasis omitted))). This court formulated the "exception" to the general rule after reviewing the following cases from other jurisdictions: *Employers Cas. Ins. Co. v. Foust,* 29 Cal.

App.3d 382, 105 Cal.Rptr. 505 (1972) [hereinafter, *Foust];  Crabtree v. State Farm Ins. Co.,* 632 So.2d 736 (La.1994) [hereinafter, *Crabtree]; Wolfe v. State Farm Ins. Co.,* 224 N.J.Super. 348, 540 A.2d 871, *cert. denied,* 111 N.J. 654, 546 A.2d 562 (1988) [hereinafter, *Wolfe]; State Farm Mut. Auto. Ins. Co. v. Ramsey,* 295 S.C. 349, 368 S.E.2d 477 (S.C.Ct.App.), *aff'd,* 297 S.C. 71, 374 S.E.2d 896 (1988) [hereinafter, *Ramsey* ]. With respect to *Ramsey, Wolfe,* and *Foust,* this court stated:

> We have reviewed these cases and find a common, factually distinguishable thread running through them. In *Ramsey,* the mother *witnessed her daughter being fatally struck* in an automobile accident. In *Wolfe,* the father pulled his daughter from a car where she had been fatally exposed to carbon monoxide and carried her into the home where he and his wife helplessly *watched a first aid squad's attempt at revival fail.* Finally, in *Foust,* a mother *witnessed the automobile accident where her son was struck* and the father learned of his child's severe injuries within ten minutes of the accident.
>
> *In all three cases, a family member directly witnessed the accident.* Here, none of the Smiths were present at the accident scene and their basis to recover damages is upon the emotional distress they allegedly suffered after Christopher's death. Thus, the Smiths' claims are consequentially related to Christopher's death.

*Lawrence,* 77 Hawai'i at 11, 881 P.2d at 498 (footnote omitted) (emphases added). This court also discussed *Crabtree v. State Farm Ins. Co.,* 632 So.2d 736 (La.1994), wherein "the wife of a motorcycle rider ... *witnessed a vehicle strike him head-on.*" *Lawrence,* 77 Hawai'i at 12–13, 881 P.2d at 499–500 (emphasis added). Relying on these cases, this court "adopt[ed] the proposition that, *if the Smiths had been witnesses to the event that caused Christopher's death,* they would have *non-derivative* and wholly independent NIED claims that would trigger separate single limits under the policy as to each

---

6. This court noted that " '[d]erivative' means 'that which has not its origin in itself, but owes its existence to something foregoing.' " *Law-*

*rence,* 77 Hawai'i at 10 n. 10, 881 P.2d at 496 n. 10 (some brackets omitted, some added).

proven claim." *Id.* at 13, 881 P.2d at 500 (some emphasis in original, some added). In other words, the *Lawrence* court held that NIED claims are derivative under Hawaii's no-fault law unless the claimant witnessed the event causing injury or death to the host plaintiff. On this basis alone, it appears that, because it is undisputed that Donald "[was] not in the Lutz car when the collision occurred and ... did not witness the actual collision" and because Tyrone survived the car accident, Donald's claim for emotional distress is derivative of Tyrone's claim for UIM benefits.

Notwithstanding the foregoing, however, the Dennisons point to the *Lawrence* court's conclusion that:

"*claims for emotional distress under Hawai'i's No–Fault Law ... are derivative if they* (a) arise in the context of motor vehicle accidents and (b) *"owe their existence" to any injury to another person that does not involve the kind of direct emotional trauma to a witness or bystander, as in Ramsey, Wolfe, Foust, and Crabtree* [.]"

*Id.* at 17, 881 P.2d at 504 (emphases added). Based on this statement, the Dennisons assert that "the dispositive question in this appeal is therefore whether [Donald] experienced the kind of 'direct emotional trauma' illustrated in *Ramsey, Wolfe, Foust,* and *Crabtree.*" The Dennisons focus on *Wolfe* inasmuch as they believe the claimants in that case "did not see the actual impact or injury-producing event." [7] Rather, contrary to the *Lawrence* court's characterization of *Wolfe* as a case in which "a family member directly witnessed the accident[,]" *Lawrence,* 77 Hawai'i at 11, 881 P.2d at 498, the Dennisons assert that, in *Wolfe,* "[w]hat her parents actually witnessed was an unsuccessful attempt to revive her." Thus, the Dennisons

believe that the *Lawrence* court did not limit recovery to only those claimants who witnessed the injury producing event. We disagree.

In *Wolfe,*

Brenda Haines [hereinafter, Brenda] died from being exposed to carbon monoxide while she sat in a car belonging to David A. Phillips. Brenda's father pulled her from the car, and carried her into the house and called the local first aid squad. Brenda's parents and their other children watched helplessly as the first aid squad's revival attempt failed.

540 A.2d at 872 (brackets added). Inasmuch as Brenda's father opened the car door, exposing himself to the carbon monoxide that caused Brenda's death, we believe her father was involved in the circumstances of her death. In other words, in coming upon the scene of Brenda's death as he did, Brenda's father witnessed the fatal "accident." Thus, the *Lawrence* court properly characterized *Wolfe* as a case in which the claimant, Brenda's father, witnessed the event causing her death. Furthermore, this court noted that the *Wolfe* court

*implied in its reasoning that a difference exists where NIED claimants have not witnessed the accident resulting in injury or death:*

While any harm to a spouse or a family member causes sorrow, we are here concerned with a more narrowly confined interest in mental and emotional stability. When confronted with accidental death, the reaction to be expected of normal persons, is shock and fright. It is the sensory perception of a shocking event which causes a separate, compen-

---

7. We note that the Dennisons further cite to cases from other jurisdictions that concern NIED generally—*i.e.,* not in the context of no-fault insurance coverage. Similarly, in *Lawrence,* the Smiths referred to the following cases, which did not concern automobile insurance: *Rodrigues v. State,* 52 Haw. 156, 472 P.2d 509, *reh'g denied,* 52 Haw. 156, 472 P.2d 509 (1970) (claim for property damage caused by surface waters overflowing a blocked drainage culvert), and *Campbell v. Animal Quarantine Station,* 63 Haw. 557, 632 P.2d 1066 (1981) (claim for emotional distress suffered when the plaintiffs' dog died in the

Animal Quarantine Station). 77 Hawai'i at 9, 881 P.2d at 496. However, the *Lawrence* court stated: "the crucial distinction overlooked by the appellees is that the Smiths' NIED claims are not being reviewed within a 'pure' tort context ... the appellees have apparently overlooked the fact that *Rodrigues* and *Campbell* were not considered within the context of automobile insurance coverage." *Id.* at 9, 881 P.2d at 496. Similarly, the cases cited by the Dennisons do not concern no-fault insurance coverage and are, therefore, inapposite to the instant case.

sable injury. In a *Portee* claim,[14] it is the plaintiff's perception which causes the perceiver to suffer a traumatic sense of loss. Such emotional distress is not equivalent of grief from losing a loved one, but is inflicted by the trauma of seeing a loved one suffer or die or of seeing efforts to revive her being unsuccessful.

14. "Portee claim" refers to *Portee v. Jaffee*, 84 N.J. 88, 417 A.2d 521 (1980), wherein the court held that emotional distress claims are not derivative, but separate and independent actions.

*Lawrence*, 77 Hawai'i at 11–12, 881 P.2d at 498–99 (quoting *Wolfe*, 540 A.2d at 873) (ellipses points omitted). This court additionally found it significant that *Wolfe* distinguished *United Pacific Ins. Co. v. Edgecomb*, 41 Wash.App. 741, 706 P.2d 233 (1985), wherein a father's claim was held to be "derivative from his son's injuries *particularly because he did not witness the accident.*" *Id.* at 12, 881 P.2d at 499 (brackets omitted) (emphasis in original) (quoting *Wolfe*, 540 A.2d at 874). Consequently, because Brenda's father witnessed the event which caused her death, the *Wolfe* court held that his claim was separate from and independent of Brenda's claim.

Citing *Wolfe*, the Dennisons assert that Donald may recover for his emotional distress inasmuch as he observed Tyrone "suffer or die or . . . efforts to revive [him] being unsuccessful." It is noteworthy, however, that the *Lawrence* court did not expressly adopt that assertion and, moreover, even assuming that this court agreed with *Wolfe*'s

assertion, the facts of this case do not permit such recovery. First, inasmuch as Tyrone survived the accident, Donald did not witness unsuccessful revival efforts or Tyrone's death. Second, it is undisputed that Tyrone was "unconscious and completely unresponsive" when Donald saw him and remained as such for two months after the accident. Thus, it cannot be said that Donald observed Tyrone suffering in pain. As such, Donald's claim for emotional distress is derivative of Tyrone's claim for UIM benefits.[8] *See id.* at 9, 881 P.2d at 496 (noting that "[c]ommon sense dictates that but for Christopher's death, [the Smiths] would not have any claims of severe emotional distress to assert in the first instance" and that, "[b]ecause the Smiths' claims clearly originate[] from the primary claim—the death of Christopher— we conclude that such claims are derivative."). Therefore, we hold that the circuit court erred in concluding that Donald was not precluded from asserting a separate and independent UIM benefits claim for his emotional distress.

## IV. *CONCLUSION*

Based on the foregoing, we hold, as a matter of law, that Donald's claim for emotional distress is derivative of Tyrone's claim for UIM benefits. Accordingly, we vacate the circuit court's September 26, 2001 order denying Liberty Mutual's motion for summary judgment and February 5, 2002 judgment in favor of the Dennisons and remand this case with instructions for the circuit court to enter judgment in favor of Liberty Mutual.

8. We agree with the dissent's proposition that this court in *Lawrence* recognized the potential for an independent claim by a family member for "witnessing serious injury to a close relation . . . *coming onto the scene of the event soon thereafter,*" Dissent at ——, 120 P.3d at 1124 (citation omitted) (emphasis in original), as discussed in *Crabtree* and *Lejeune v. Rayne Branch Hosp.*, 556 So.2d 559 (La.1990). However, we do not believe that it applies to the facts of the instant case. In *Crabtree*, the court held that a woman's claims for emotional distress were independent because she was "in the accident." 632 So.2d at 745. There, the claimant, who was following her husband in another vehicle, witnessed a vehicle strike him head-on, and rushed to his side where she saw his leg nearly completely severed below

the knee. In *Lejeune*, the court approved of a cause of action by the wife of a comatose patient who arrived at his hospital room shortly after a rat had bitten him on the face and before he had either been moved or bandaged. 556 So.2d at 571. These facts do not align themselves with the instant case inasmuch as Donald did not "timely arrive at the immediate scene of the accident." *Crabtree*, 632 So.2d at 745 n. 19. Rather, Donald learned of the accident while at home and arrived at the "triage area" which was "down the street from the site of the collision," Stipulated Statements of Fact (SSF) No. 10, approximately thirty minutes after the accident occurred and saw Tyrone unconscious in the ambulance. *See* SSF Nos. 1, 7, 13, and 16.

Dissenting Opinion by ACOBA, J.

In *First Ins. Co. of Hawai'i v. Lawrence*, 77 Hawai'i 2, 8, 881 P.2d 489, 495, *reconsideration denied*, 77 Hawai'i 373, 884 P.2d 1149 (1994), it was concluded that, under the Hawai'i No–Fault Law, tort liability was abolished except with respect to "accidental harm" sustained by persons "in" a motor vehicle accident. In that regard, this court decided that generally, negligent infliction of emotional distress claims as an aspect of "accidental harm" are to be treated as derivative claims rather than independent claims under the no fault law. *Id.* at 4, 881 P.2d at 491. *Lawrence* went on to hold that "derivative claims are not subject to separate 'each person' liability coverage limits[,]" *id.*, in an automobile insurance policy.

Thus, this court declared that the plaintiffs in the underlying case of *Lawrence*, the "Smith claimants[,] . . . must first meet the threshold requirement that [their] accidental harm occurred 'in' the accident." *Id.* at 11, 881 P.2d at 498. But this court observed that "[t]he Smiths were not involved in nor did they witness the [subject] accident." *Id.* at 5, 881 P.2d at 492. It was decided, therefore, that "[b]ecause the Smiths' claims clearly originate[d] from the primary claim—the death of Christopher—. . . that such claims are derivative." *Id.* at 9, 881 P.2d at 498. As a result the Smiths' "independent claims of emotional distress separate and apart from the claim being made on behalf of Christopher by his estate[,]" *id.*, were rejected by this court.

Nevertheless, it was recognized that because the no fault law was "in derogation of principles of common law tort liability, [it] must be strictly construed. . . ." *Id.* at 8, 881 P.2d at 495 (internal quotation marks and citations omitted). Despite the fact that the Smiths had not been involved in the accident, it was determined "[b]ased on the analysis of [other] authorities . . . that, if the Smiths had been witnesses to the event that caused Christopher's death, they would have . . . independent . . . claims[.]" *Id.* at 13, 881 P.2d at 500. Thus, on a claim for emotional distress, this court indicated that not only one involved in an accident but also one who was a witness to an accident could assert an

independent claim. *See infra.* In adopting this "witness" exception to the requirement that the plaintiffs' accidental harm occur "in" the accident, this court also seemingly acknowledged a corollary to the witness exception that included a claim of one "timely present at the immediate scene of the accident." *Id.* at 13, 881 P.2d at 500 (internal quotation marks and citation omitted). In the context of the witness exception adoption, this court said:

> It is undisputed that the Smiths did not witness the accident *nor were they "timely present at the immediate scene of the accident."* [*Crabtree v. State Farm Ins.*, 632 So.2d 736, 745 n. 19 (La.1994)]. Thus, the cases relied upon by the appellees are inapposite here.
>
> Based on the analysis of the authorities cited above, *we adopt the proposition that if the Smiths had been witnesses to the event that caused Christopher's death*, they would have *non-derivative* and wholly independent [negligent infliction of emotional distress] claims that would trigger separate single limits under the policy as to each proven claim.

*Id.* (emphasis in original and emphases added). Under such a corollary, "the court recognize[s] a cause of action for witnessing serious injury to a close relation in either viewing the event causing the injury *or coming onto the scene of the event soon thereafter.*" *Id.* at 13 n. 15, 881 P.2d at 500 n. 15 (citing *Lejeune v. Rayne Branch Hosp.*, 556 So.2d 559 (La.1990)) (emphasis added). Based on the passages above and as the circuit court in the instant case noted, "the rule espoused by *Lawrence* . . . does not preclude as a matter of law the assertion of an independent claim for emotional distress where the claimant did not witness the collision itself but was 'timely present' thereafter at the accident scene."

In recognizing that the no fault statute must be strictly construed, an exception to the requirement that accidental harm must be sustained "in" the motor vehicle accident was approved for familial witnesses to accidents. That policy and logic warrant the same treatment under the law for one who witnesses the accident involving a relative and one who timely arrives "at the immediate

scene" of the accident involving a relative, in light of the tort's objective of independently protecting against "serious mental distress." *Rodrigues v. State*, 52 Haw. 156, 173, 472 P.2d 509, 520 (1970). No new objections can be raised reasonably to the recognition of a claim of one timely on the scene than would exist with respect to a witness to an accident. The safeguards against disproportionate verdicts for family witnesses timely on the scene of an accident would be the same as "in innumerable other negligence cases where a 'reasonable [person]' standard and general tort principles are applied[.]" *Id.* at 175 n. 8, 472 P.2d at 521 n. 8.

The majority maintains, however, that the facts of this case do not fit into the rubric of

" 'coming onto the scene of the event soon thereafter,' . . . as discussed in *Crabtree* and *Lejeune*[ ]." Majority opinion at 388 n. 8, 120 P.3d at 1123 n. 8. *Crabtree*, however, was not concerned with applying that test[1] and *Lejeune* would not foreclose the claim of Defendant–Appellee Donald H. Dennison (Donald).[2] The parameters of the "scene" and the measurement of the "soon thereafter" are issues to be determined by the fact finder on a case-by-case basis subject only to this court's determination on "whether the case presents questions on which reasonable men would disagree[.]" *Rodrigues*, 52 Haw. at 175 n. 8, 472 P.2d at 521 n. 8.

Under the stipulated facts, Donald arrived at the "triage area" and saw his son in the

1. While the majority cites to *Crabtree v. State Farm Ins. Co.*, 632 So.2d 736 (La.1994), that case does not resolve the issue of what constitutes a claimant's arrival at the accident or injury scene. In *Crabtree*, the court found that the claimant, Mrs. Crabtree, met all the requisites for a *"Lejeune* claim," which is the "right to recover damages for severe mental pain and anguish caused by witnessing serious injury to a close relation." *Id.* at 738. The court interpreted the claim in light of an insurance policy which allowed for $50,000 in coverage for "all damages due to bodily injury to two or more persons in the *same accident." Id.* at 739 (emphasis added). Thus, in determining whether Mrs. Crabtree could recover under the policy, the court had to decide whether Mrs. Crabtree suffered her mental anguish in the "same accident" as that which caused the victim's bodily injuries. *Id.* Because the court found that Mrs. Crabtree directly witnessed the event causing her mental anguish, (her husband being hit by another car), it concluded that the mental anguish she suffered occurred "in the same accident" as that which caused her husband's bodily injuries. *Id.* at 745. Inasmuch as Mrs. Crabtree directly witnessed the injury-causing event, the *Crabtree* court did not have to engage in any analysis of what constitutes the "accident scene." *Crabtree* thus is not instructive in defining the meaning of "accident scene." While Defendant–Appellee Donald H. Dennison (Donald) did not directly witness his son's injury, that does not disqualify his claim under *Crabtree*.

2. In *Lejeune v. Rayne Branch Hosp.*, 556 So.2d 559, 561 (La.1990), the Supreme Court of Louisiana found that Mrs. Lejeune successfully stated a cause of action for mental pain and anguish damages arising from her discovery that her hospitalized comatose husband had sustained rat bites. The court examined the circumstances, concluding in pertinent part that "[a claimant] must . . . either view the accident or injury-causing event or *come upon the accident scene soon thereafter and before substantial change has oc-*

curred in the victim's condition." *Id.* at 569–70 (emphasis added). In determining that Mrs. Lejeune effectively stated a cause of action, the court relied on the fact that "Mrs. Lejeune arrived at her husband's hospital room shortly *after* the injury-causing event and *after* the student nurse cleaned blood from Mr. Lejeune's wounds." *Id.* at 571 (emphases added). Her husband's appearance was not "appreciably chang[ed]," he remained in the same room, and he had not been bandaged. *Id.* However, some of the blood on his face had been removed. *Id.*

In the case at hand, the facts indicate that Donald arrived at the "triage area" which was "down the street from the site of the collision" approximately thirty minutes after the accident and saw his son in an unconscious and unresponsive condition in the ambulance. Accordingly, Donald's son's appearance had not "appreciably changed" because he remained in an unconscious and unresponsive state from the accident. Apparently, the only change in appearance is that he had a mask partially covering his face. As in *Lejeune*, then, there was also a slight change in appearance due to the nurse having cleaned blood from the victim's wounds. *Id.* at at 562.

The facts in the instant case do not show that "substantial change ha[d] occurred in the victim's condition," *id.* at 570, because Donald's son remained in the unconscious and unresponsive state that the accident ostensibly caused. Similarly, the victim in *Lejeune* remained essentially the same. While the *Lejeune* court did note the fact that the victim there had not been moved to another room, the court did not define, nor express the bounds of what might encompass the "scene of the injury." *Id.* at 571. Therefore, while Donald's son had been moved from the site of the collision to the "triage area" which was "down the street from the site of the collision," *Lejeune* does not indicate whether such movement would lie outside the bounds of what constitutes the appropriate scene.

ambulance—circumstances one might reasonably expect to encounter at the "scene" of an automobile accident. He arrived within thirty minutes of the accident, not a lengthy period after the accident. The "scene" and time of arrival under these facts were not so remote from the accident so as to absolutely preclude consideration of Donald's claim under the test. This is a case where " 'reasonable persons in the exercise of fair and impartial judgment may reach different conclusions upon the crucial issue[.]' " *Chambers v. City & County of Honolulu,* 48 Haw. 539, 541, 406 P.2d 380, 382 (1965) (quoting *Young v. Price,* 47 Haw. 309, 313, 388 P.2d 203, 206 (1963)). It is not a case where reasonable persons could reach only one conclusion. Any dispute in this case as to the compensable nature of the distress is an issue which appropriately concerns the amount of damages, if any, that should be awarded and should not operate as a bar to consideration of the claim itself. In view of the facts here, Donald was one who should not be excluded as a matter of law from asserting such a claim.

Accordingly, I respectfully disagree and would affirm the circuit court's order denying both Plaintiff–Appellant Liberty Mutual's Motion for Summary Judgment and Defendants–Appellees Donald and Lynn T. Dennison's Motion for Summary Judgment.