149 P.3d 495

UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL–CIO, Applicant–Appellee,

v.

DAWSON INTERNATIONAL, INC., Respondent–Appellant.

No. 27105.

Supreme Court of Hawai‘i.

Dec. 18, 2006.

John R. Dwyer, Jr. (of Dwyer Schraff Meyer Grant & Green), and Blake W. Bushnell (of Bushnell & Miller), on the briefs, Honolulu, for respondent-appellant.

James E.T. Koshiba, Charles A. Price, and Andrew D. Stewart (of Koshiba Agena & Kubota), on the briefs, Honolulu, for applicant-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, AND DUFFY, JJ.; ACOBA, J., Dissenting.

Opinion of the Court by MOON, C.J.

Respondent-appellant Dawson International, Inc. (Dawson) appeals from the January 6, 2005 final judgment of the Circuit Court of the First Circuit, the Honorable Bert I. Ayabe presiding, confirming an amended arbitration award in favor of applicant-appellee United Public Workers, AFSCME, Local 646, AFL–CIO [hereinafter, UPW]. Briefly stated, the instant case involves a prepaid legal service plan implemented by UPW, pursuant to Hawai'i Revised Statutes (HRS) chapter 488,[1] for the benefit of UPW's members. UPW, as plan sponsor, entered into a two-year contract with Dawson, as the plan administrator.[2] Nine months into the contract, UPW terminated the contract, demanding that Dawson return the balance of prepaid premiums that Dawson held in reserve. In response, Dawson maintained, *inter alia*, that UPW had breached the contract by its unilateral termination, thereby entitling Dawson to damages. Pursuant to the dispute resolution provisions contained in their contract, the parties proceeded to arbitration, which initially resulted in an arbitration award in favor of Dawson in the amount of $25,074.00, plus the right to retain the balance of the monies held in reserve, amounting to $87,240.08. Thereafter, UPW filed a motion to modify or correct the arbitration award in the Circuit Court of the First Circuit, the Honorable Dexter D. Del Rosario presiding, on the ground of an evident mathematical miscalculation. Dawson, on the other hand, moved for confirmation of the award. Persuaded by the arguments advanced by UPW, the circuit court remanded the case to the arbitrator and stayed the circuit court proceeding until the arbitrator ruled on the alleged mathematical miscalculation. Ultimately, the arbitrator reversed himself, issuing an amended award in favor of UPW in the amount of $189,924.00. Thereafter, the circuit court confirmed the amended arbitration award, denied Dawson's

motion to vacate the amended award and confirm the original award (Dawson's motion to vacate), and entered final judgment in favor of UPW on January 6, 2005.

On appeal, Dawson challenges the circuit court's confirmation of the amended arbitration award and denial of Dawson's motion to vacate. Specifically, Dawson maintains that, because HRS chapter 658 (1993) [hereinafter, HRS chapter 658 or the old arbitration law]—as opposed to HRS chapter 658A (Supp.2005) [hereinafter, HRS chapter 658A or the new arbitration law]—governs the instant case, the circuit court erred in remanding the case to the arbitrator to consider UPW's motion to modify or correct the original arbitration award.

Based on the discussion *infra*, we hold that: (1) HRS chapter 658 governs the instant case; and (2) under HRS chapter 658, the circuit court did not have the authority to remand the case to the arbitrator. Accordingly, we vacate the circuit court's January 6, 2005 final judgment and remand this case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

The following facts are substantially taken from the original arbitration award, dated March 18, 2004, in light of the deference required to be shown to the arbitrator's view of the facts. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37–38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) ("Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept.").

---

1. HRS § 488–1(3) (1993) defines "prepaid legal service plan" as

 a group legal service plan in which the cost of the services are prepaid by the group member or by some other person or organization in the member's behalf. A group legal service plan is a plan by which legal services are rendered to

individual members of a group identifiable in terms of some common interest.

2. "Plan administrator" means "those persons who have discretionary authority for the management of the plan or for the collection, management, or disbursement of plan moneys." HRS § 488–1(2) (1993).

### 1. The Agreement Between UPW and Dawson

On February 24, 2000, UPW entered into a two-year contract with Dawson [hereinafter, the Plan Agreement][3] under which Dawson was to administer a prepaid legal service plan (the Plan) for the benefit of approximately 11,000 to 12,000 state and county employees in collective bargaining Units 1 and 10.[4] The Plan was established to provide eligible unit employees [hereinafter, the covered employees] access to certain free or discounted legal services.

Specifically, Dawson agreed, *inter alia*, to "select a qualified referral panel of licensed attorneys," and UPW agreed to make monthly premium payments to Dawson. Premiums were to be paid by the state and county employers to UPW, and, in turn, UPW was to transfer the premiums to Dawson. Upon receipt, Dawson was required to place the prepaid premiums in a segregated account (the reserve) to be disbursed at its discretion to pay for the Plan's attorneys, operation of the Plan, legal education, research, and other uses, such as increasing benefits to the covered employees.

The Plan Agreement also contained the following dispute resolution procedures [hereinafter, the dispute resolution provisions]:

#### 5.01 Notice of Violation.

Should either party allege a violation of this Agreement, the party alleging the violation shall notify in writing the other party of the alleged violation within thirty (30) days of the alleged violation or within thirty (30) days of realizing the alleged violation.

#### 5.02 Violation Resolution.

Should the violation not be resolved within thirty (30) days after notification of the violation[,] the resolution procedure as provided in Section 5.03 shall apply.

#### 5.03 Resolution Procedure.

The parties shall submit the violation to mediation before resorting to arbitration. The mediator(s) shall be selected by mutual agreement of the parties. In the event the violation is not resolved in mediation[,] the violation shall be submitted to arbitration. Within fifteen (15) days after the conclusion of mediation[,] the parties shall select an Arbitrator by mutual agreement. Negotiations, mediation or arbitration shall be conducted on Oʻahu, Hawaiʻi.

(Underscored and bold emphases in original.) The Plan Agreement became effective on April 3, 2000 and was to expire on March 31, 2002.

### 2. Termination of the Plan Agreement

On January 2, 2001, nine months into the twenty-four month contract, UPW notified Dawson that the Plan was "terminated" effective December 31, 2000 "because the employer[s'] contribution that funded the ... Plan [was] terminated," *i.e.*, the employers had ceased to contribute the premiums necessary for the viability of the Plan.[5] Although UPW indicated it would pay Dawson for any operational expenses incurred through December 31, 2000, UPW demanded that the balance of the funds in the reserve be returned to UPW.

On January 5, 2001, Dawson informed UPW of its position that UPW was in breach of the Plan Agreement inasmuch as the agreement did not provide the right to uni-

---

3. Section 4.01 of the Plan Agreement specifically provides that the agreement

 shall remain in effect for two (2) years unless modified by mutual agreement. It shall be renewed thereafter for two (2) year periods unless it is terminated after submission of a written notice of termination at least ninety (90) days in advance of the termination by the UPW or [Dawson].

4. Unit 1 employees are non-supervisory blue collar public workers, including garbage men and janitors. Unit 10 employees are blue collar pub-

lic institutional, health, and correctional workers, including state hospital workers and prison guards. Employers of Unit 1 and Unit 10 employees are the State of Hawaiʻi and the counties. UPW is the exclusive bargaining representative for Unit 1 and Unit 10 workers.

5. In its answering brief, UPW proffers a different reason as to why it terminated the Plan Agreement, *i.e.*, because it "believed that the [P]lan was primarily benefitting Dawson and not the Unit 1 and Unit 10 employees."

laterally terminate the contract. Dawson further advised UPW that: (1) the unused balance of premiums would remain in the reserve to assure delivery of "legal services, education programs, operating costs and other financial obligations for the term of the contract" (internal quotation marks omitted); and (2) "[it] will continue to provide legal services to covered employees until such time as resolution is reached by approval of both parties" (internal quotation marks and original brackets omitted). Correspondence between the parties revealed that UPW continued to maintain its position that Dawson comply with the termination notice while Dawson maintained its position that, because the contract had a two-year minimum term, it would continue to comply with its contractual obligations.

### B. Procedural History

#### 1. The Arbitration Proceeding

Inasmuch as the parties made no progress toward resolution, Dawson demanded, on March 21, 2001, that Dispute Prevention & Resolution, Inc. (the DPR) begin the resolution procedure set forth in section 5.03 of the Plan Agreement, i.e., the mediation/arbitration process. For reasons that are unclear from the record, the alternative dispute resolution process was never completed.

Two years later, on April 17, 2003,[6] UPW suggested that the parties submit the dispute to arbitration.[7] On August 25, 2003, the parties selected attorney James T. Paul as the arbitrator. Three days later, on August 28, 2003, UPW executed an "Agreement to Participate in Binding Arbitration" [hereinafter, the DPR Arbitration Agreement], which provides in its entirety:

> By agreement of the parties set forth below, [the DPR]/James Paul, Esq. have agreed to conduct a binding arbitration of

the matters in controversy between the parties. James Paul, Esq. has agreed to serve in the capacity of a neutral and unbiased Arbitrator and will provide arbitration services to the parties on an impartial basis. It is understood [that,] as a neutral[,] the Arbitrator will not act as attorney or advocate for any party. *The parties, DPR, and James Paul, Esq. agree to follow and abide by the DPR Arbitration Rules, Procedures & Protocols, as established by [the] DPR.*

Unless the parties' agreement provides otherwise, the Arbitrator must determine all issues submitted to arbitrator by the parties and may grant any and all remedies that the Arbitrator determines to be just and appropriate under the law. In the Award of Arbitrator, the Arbitrator shall issue a determination on the issue of all arbitration-related fees and costs, including: Arbitrator's compensation and expenses; [the] DPR's fees and expenses; and, if provided for in the parties' agreement or the Submission to Arbitration, attorney's fees and costs.

The DPR/Arbitrator fee is $275.00/hour, plus GET, plus any out of pocket expenses. Initially the parties are responsible for the DPR/Arbitrator's fees and out of pocket expenses on an equal basis. [The] DPR shall collect deposits from the parties in advance for all fees and expenses to be incurred in this matter. All funds deposited with [the] DPR shall be held in trust. [The] DPR will issue payment to the Arbitrator at the conclusion of this matter and in accordance with this Agreement.

(Emphasis added.) Dawson, however, did not execute the DPR Arbitration Agreement until January 30, 2004, after UPW agreed to advance Dawson's share of the arbitrator's anticipated fees of $6,000.[8]

---

**6.** Several developments—not relevant to the disposition of this appeal—impacted the pace of the resolution of the parties' dispute, such as a criminal proceeding against the then-director of UPW, Gary W. Rodrigues, and the medical condition of Dawson's principal, Donald Dawson.

**7.** The record does not indicate whether the parties submitted their dispute to mediation prior to resorting to arbitration, as required by section 5.03 of the Plan Agreement. The parties, howev-

er, do not dispute that the Plan Agreement contained a provision for binding arbitration.

**8.** Apparently, on January 27, 2004, the DPR advised the parties that, unless Dawson paid or UPW advanced the $6,000 initial deposit for the arbitrator's anticipated arbitration fees and Dawson returned its counter-signed copy of the DPR Arbitration Agreement, the DPR intended to cancel the arbitration hearings. The same day,

On February 12, 2004, the parties filed their respective arbitration briefs with the DPR. Dawson essentially claimed that UPW breached the Plan Agreement and, therefore, owed Dawson an additional $1,388,674 in plan premiums (equivalent to premiums for the remaining fifteen months of the two-year contract). UPW, on the other hand, asserted that it rightfully terminated the agreement, and, in any event, Dawson had a duty to mitigate its damages. UPW maintained that it was entitled to the return of the balance of prepaid funds being held in reserve by Dawson as of the date UPW terminated the Plan Agreement, *i.e.*, December 31, 2000.

### 2. The Original Arbitration Award

After a three-day arbitration hearing, which was held on February 18, 19, and 20, 2004, the arbitrator issued his arbitration award on March 18, 2004 (the original award). The arbitrator found that UPW's early termination was a breach of the Plan Agreement and that, therefore, Dawson was entitled to all of its administrative fees anticipated to be paid under the two-year agreement, plus its out-of-pocket expenses, subject to Dawson's obligation to mitigate those expenses. In determining the amount of damages, the arbitrator relied upon Dawson's Plan Income Statement and other financial records, which reflected, *inter alia*, the following:

> UPW informed the DPR that it was "willing to also pay Dawson's $6,000 share in order to keep the arbitration hearings in place and to have this matter finally resolved."

**9.** As previously indicated, the arbitrator decided that Dawson was entitled to all of its administrative fees anticipated to be paid under the two-year agreement, plus its out-of-pocket expenses, subject to Dawson's obligation to mitigate those expenses. At the arbitration hearing, Dawson maintained that it had utilized a portion of its administrative fees to pay for the expenses of continuing to operate the Plan. The alleged "double payment of fees" centers around the arbitrator having apparently credited to Dawson—as administrative fees—the amount utilized to pay expenses, but also awarded all of the administrative fees anticipated to be paid under the contract.

**10.** HRS § 658A–20, entitled "Change of award by arbitrator," provides in relevant part:

| | |
|---|---|
| Premiums received from UPW . . . . . . . . | $799,326.00 |
| Total expenses paid from the Reserve . . . | − 719,023.60 |
| Subtotal . . . . . . . . . . . . . . . . . . . . . . . . | 80,302.40 |
| Interest/Investment Gain . . . . . . . . . . . . . | + 6,937.68 |
| **TOTAL Balance in Reserve** . . . . . . . . | $ 87,240.08 |

Ultimately, the arbitrator (1) permitted Dawson to retain the balance in the reserve, *i.e.*, $87,240.08, and (2) required UPW to pay Dawson an additional $25,074.00 for fees and expenses incurred and anticipated to be paid over the two-year contract period, *i.e.*, from April 3, 2000 to March 31, 2002.

### 3. UPW's Motion to Modify or Correct the Original Award and the Amended Arbitration Award

Immediately after the entry of the original award, UPW sent a letter, dated March 22, 2004, to the arbitrator, seeking corrections of the amounts awarded based upon an alleged evident mathematical miscalculation. UPW essentially argued that the original award constituted "a double payment of fees."[9] The letter apparently was sent pursuant to Rule 31 of the DPR Arbitration Rules (DPRAR), which provides that "[p]arties may apply to the [a]rbitrator(s) to modify, correct or clarify an [a]ward, pursuant to the procedures specified in the [Revised Uniform Arbitration Act (RUAA)], Section 20." "Section 20," *i.e.*, HRS § 658A–20 (Supp.2005),[10] allows a party to request the arbitrator to

> (a) On motion to an arbitrator by a party to an arbitration proceeding, the arbitrator may modify or correct an award:
> (1) Upon a ground stated in section 658A–24(a)(1) or (3);
> (2) Because the arbitrator has not made a final and definite award upon a claim submitted by the parties to the arbitration proceeding; or
> (3) To clarify the award.
> HRS § 658A–24(a)(1) (Supp.2005) provides:
> (a) Upon motion made within ninety days after the movant receives notice of the award pursuant to section 658A–19 or within ninety days after the movant receives notice of a modified or corrected award pursuant to section 658A–20, the court shall modify or correct the award if:
> (1) There was an evident mathematical miscalculation or an evident mistake in the description of a person, thing, or property referred to in the award[.]

correct evident mathematical miscalculations in an arbitration award.[11]

On March 23, 2004, the arbitrator informed both parties that, "absent an agreement by both parties to re-open this matter, or unless ordered by the [circuit c]ourt, the [a]rbitrator no longer has jurisdiction in this matter." By letter dated March 30, 2004 to the arbitrator, Dawson "object[ed] to any attempt by UPW to reopen the [a]rbitration hearings." Additionally, via a letter dated April 5, 2004 to the arbitrator, Dawson argued that HRS chapter 658 (the old arbitration law) applied because (1) HRS § 658A–3 (Supp.2005) of the new arbitration law provides in relevant part that "this chapter governs an agreement to arbitrate made *on or **after** July 1, 2002,*" (emphases added) and (2) the Plan Agreement was made on February 24, 2000. Also, under the old arbitration law, specifically, HRS § 658–10 (1993), quoted *infra*, the court—not the arbitrator—is authorized to modify or correct an arbitration award.

UPW, however, maintained that:

[T]he old arbitration [law] does not apply to this issue because the parties expressly agreed to abide by [the DPRAR] when signing DPR's "Agreement to Participate in Binding Arbitration[,]" [ (executed by UPW on August 28, 2003 and by Dawson on January 30, 2004) ]. Rule 31 of [the DPRAR] allows UPW to request that [the arbitrator] modify, correct or clarify the Award pursuant to procedures specified in the new arbitration [law.]

On April 8, 2004, DPR, through its president and CEO, Keith W. Hunter, informed the parties that:

Pursuant to HRS [chapter] 658 and based on the parties' earlier understanding that this matter was governed under HRS [chapter] 658, the [a]rbitrator in this matter, James Paul, Esq., is *functus officio*. [[12] *Id.* at 207, 830 P.2d at 507 (format altered) (citation omitted).] Absent an order from an appropriate [c]ourt, Mr. Paul lacks authority to act on the request for reconsideration[.]

In the meantime, UPW filed a motion with the circuit court to modify or correct the original award, pursuant to HRS §§ 658A–20 or –24(a)(1), or, in the alternative, HRS § 658–10 [hereinafter, UPW's motion to modify] on March 29, 2004. Specifically, UPW requested that the circuit court remand the matter to the arbitrator for a determination as to whether a correction of the original award was warranted based upon an alleged evident mathematical miscalculation. On April 8, 2004, Dawson moved the circuit court to confirm the original award [hereinafter, Dawson's motion to confirm], pursuant to HRS § 658–8 (1993).[13] In addition, Dawson filed its memorandum in opposition to UPW's motion to modify on May 12, 2004, reiterating its position that: (1) HRS chapter 658 was applicable, thereby rendering a remand to the arbitrator inappropriate; and (2) there

---

11. On the same day, Dawson served, but did not file, a motion to confirm the original award, pursuant to, *inter alia*, HRS § 658A–22 (Supp. 2005). HRS § 658A–22 provides:

After a party to an arbitration proceeding receives notice of an award, the party may make a motion to the court for an order confirming the award at which time the court shall issue a confirming order unless the award is modified or corrected pursuant to section 658A–20 or 658A–24 or is vacated pursuant to section 658A–23.

12. In *The Arbitration of Board of Directors of the Association of Apartment Owners of the Tropicana Manor v. Jeffers*, 73 Haw. 201, 830 P.2d 503 (1992) [hereinafter, *Jeffers* ], this court, in describing *"functus officio,"* stated:

When an award has been made, the authority of the arbitrator comes to an end. He becomes *functus officio*. Under general princi-

ples of arbitration law[,] he cannot in any way change or explain his award unless his authority is reinstated in writing by all parties, or the matter is returned to him by the appropriate court.

*Id.* at 207, 830 P.2d at 507 (format altered) (citation omitted).

13. HRS § 658–8 provides in pertinent part:

At any time within one year after the award is made and served, any party to the arbitration may apply to the circuit court specified in the agreement, or if none is specified, to the circuit court of the judicial circuit in which the arbitration was had, for an order confirming the award. Thereupon[,] the court shall grant such an order, unless the award is vacated, modified, or corrected, as prescribed in sections 658–9 and 658–10.

On August 31, 2004, Dawson withdrew its motion to confirm the original award.

was no "evident miscalculation of figures" in the original award.

Both motions were scheduled for hearing on May 19, 2004. Prior to commencing the hearing, the circuit court held a chambers conference and asked Dawson whether it was willing to agree to UPW's request to have the arbitrator decide UPW's motion to modify. Dawson objected on grounds that (1) the original award was not ambiguous on its face and (2) the arbitrator had no jurisdiction to decide a motion under HRS § 658–10 because UPW's motion must be decided by the court. The circuit court, therefore, proceeded with the hearing on UPW's motion to modify and Dawson's motion to confirm.

During the hearing, UPW argued that:

[T]here's no question ... [that,] in September 2003[,] the old [arbitration law] applied to these proceedings because the proceedings arise out of a contract that contained an arbitration provision that predates the effective date of the statute, the new arbitration [law]. So no question [that,] absent an agreement to the contrary[,] the old [arbitration law] applies.

. . . .

But circumstances changed in January 2004. January 2004[,] Dawson ... signed a record, a written agreement to participate in binding arbitration in which they agreed to the DPR rules[,] including Rule 31 which says the arbitrator can modify and correct an arbitration award under the new statute's delineated provisions. So I agree, yes, at one time there was no agreement, but then the parties changed their position and there was an agreement.

UPW also asserted that the original award resulted in a double recovery for Dawson.

Dawson argued that the old arbitration law applied and pointed to the arbitrator's refusal to consider UPW's March 22, 2004 request for correction unless ordered by the court as evincing the fact that the arbitrator also believed that the old arbitration law applied. Dawson also maintained that there was no mistake in the original award, arguing that:

[W]e're not talking about an evident miscalculation. We're talking about a substantive issue that this court ought not

deal with when we're talking about an arbitrator's award. The fact is they are in fact challenging those findings of fact and basically complaining that Dawson should not recover damages because the factual findings are wrong.

At the conclusion of the hearing, the circuit court stated:

I've reviewed the pleadings and considered the arguments of counsel as well as the authorities cited, and the initial issue is whether the court should remand this matter back to the arbitrator to consider the substantive issue of whether the arbitrator's award should be confirmed.

The court is persuaded by the argument and the authorities cited by UPW that this matter be remanded to the arbitrator, so the court will remand this matter to the arbitrator for its consideration of UPW['s] application to modify, correct, or clarify the arbitration's award.

On June 2, 2004, the circuit court issued its written order, which specifically stated:

UPW's request for the [c]ourt to remand/resubmit UPW's request to modify, correct or clarify the [original a]ward to Arbitrator James T. Paul, Esq. for his consideration and decision is granted. Further hearing on this matter is continued until after the [a]rbitrator has issued his decision.

On August 30, 2004, the arbitrator issued an amended arbitration award (the amended award), apparently agreeing with UPW regarding the alleged duplicative damage award. As a result, the arbitrator recalculated the award and concluded that Dawson reimburse UPW the amount of $189,924.00 (as opposed to his prior decision that allowed Dawson to retain the balance in the reserve, plus receive an additional $25,074.00 from UPW).

### 4. UPW's Motion to Confirm and Dawson's Motion to Vacate the Amended Award

On September 2, 2004, UPW filed with the circuit court a motion for an order confirming the amended award [hereinafter, UPW's motion to confirm], pursuant to HRS § 658A–

22, or, alternatively, HRS § 658–8. Thereafter, on September 9, 2004, Dawson moved in the circuit court to vacate, modify, correct or clarify the amended award [hereinafter, Dawson's motion to vacate], pursuant to HRS §§ 658A–23 (Supp.2005),[14] –20(d)(1) through (3), and –24(a)(1), or, alternatively, HRS §§ 658–9 (1993), quoted *infra,* and –10 (1993). Specifically, Dawson argued, *inter alia,* that: (1) under HRS chapter 658, the circuit court had no authority to remand the matter to the arbitrator and that the arbitrator exceeded his authority by reopening the hearing; (2) it was error to impose a duty to mitigate; and (3) the arbitrator committed a miscalculation in revising the original award.

That same day, September 9, 2004, Dawson filed a separate motion in the arbitration proceedings, requesting the arbitrator to modify, correct, or clarify the amended award [hereinafter, Dawson's motion to modify]. The parties subsequently entered into discussions regarding a stipulation to the arbitrator's jurisdiction to review Dawson's motion to modify. In a letter to UPW's counsel, dated October 15, 2004, Dawson's counsel wrote:

> I am enclosing a signed copy of the [s]tipulation in the format approved by you and sent over yesterday for my signature. As confirmed on a couple of occasions by the [a]rbitrator, all proceedings prior to this date were conducted by the [a]rbitrator pursuant to HRS [c]hapter 658. That's why he is requiring a stipulation by the parties to allow the current motion[, *i.e.,* Dawson's motion to modify,] to be reviewed by him pursuant to HRS [c]hapter

658A. *Although you have not agreed to include express mutual non-waiver language in the [s]tipulation, it is still our client['s] intent and position that the agreement by way of stipulation only be applied prospectively. Our client[ is] not waiving or releasing any claims, defenses or positions with respect to prior proceedings and decisions.*

(Emphasis added.) On October 18, 2004, the parties stipulated that the arbitrator shall have jurisdiction, pursuant to DPRAR Rule 31 and HRS §§ 658A–20(a)(1) through (3), to consider and decide Dawson's motion to modify. After briefing and a hearing, the arbitrator denied Dawson's motion to modify via his written order filed in the arbitration proceedings on November 8, 2004.

On November 9, 2004, Dawson filed a memorandum in opposition to UPW's motion to confirm, wherein Dawson reiterated that

> [c]orrecting or modifying the amount of the award by the [a]rbitrator is not permitted. [U]nder Hawai'i law governing Chapter 658 arbitrations, the [c]ourt cannot delegate its statutory authority to correct or modify a monetary award to an [a]rbitrator, nor does the [a]rbitrator have the jurisdiction to reopen the arbitration and hold a hearing on a motion filed under HRS § 658–10.

Dawson further argued that

> a finding that the original [award] was "patently ambiguous" ... is a condition precedent to the [circuit c]ourt's ability to remand to an arbitrator for "clarification."

---

14. HRS § 658A–23 provides in relevant part:

**Vacating award.** (a) Upon motion to the court by a party to an arbitration proceeding, the court shall vacate an award made in the arbitration proceeding if:

(1) The award was procured by corruption, fraud, or other undue means;

(2) There was:

 (A) Evident partiality by an arbitrator appointed as a neutral arbitrator;

 (B) Corruption by an arbitrator; or

 (C) Misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;

(3) An arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise

conducted the hearing contrary to section 658A–15, so as to prejudice substantially the rights of a party to the arbitration proceeding;

(4) An arbitrator exceeded the arbitrator's powers;

(5) There was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection under section 658A–15(c) not later than the beginning of the arbitration hearing; or

(6) The arbitration was conducted without proper notice of the initiation of an arbitration as required in section 658A–9 so as to prejudice substantially the rights of a party to the arbitration proceeding.

(Bold emphasis in original.)

*Gozum [v. Am. Int'l Adjustment Co.,* 72 Haw. 41, 44–46, 805 P.2d 445, 446–47 (1991)]. Therefore, the June 2, 2004 Order reversing and modifying the original [award] from a judgment in favor of the winner, [Dawson], to a judgment in favor of the loser, UPW, was clearly a situation where the remand from the [c]ourt was invalid and the [a]rbitrator also exceeded his power and lawful jurisdiction. Moreover, there was no finding of ambiguity in the original award as a basis for remand. *See Jeffers,* [*supra*].

Lastly, Dawson asserted that the arbitrator .erred in (1) treating mitigation of damages as an affirmative claim, as opposed to an affirmative defense and (2) disregarding the law of contract damages, which prevents a breaching party from recovering damages against a non-breaching party.

On the same day, November 9, 2004, UPW filed its memorandum in opposition to Dawson's motion to vacate. UPW argued that no ground to vacate the amended award existed inasmuch as "Dawson's motion does not allege any fraud, evident partiality, corruption, misconduct, or misbehavior by the [a]rbitrator, or that the [a]rbitrator exceeded his powers, did not allow evidence, or give proper notice of the proceedings," as required under HRS § 658A–23 and HRS § 658–9. Thereafter, UPW also filed its memorandum in support of its motion to confirm, contending, *inter alia,* that:

[1.] Dawson's memorandum in support of its motion to vacate, filed November 9, 2004, for the first time alleged statutory grounds for vacating the [amended] award. Dawson specifically cites to HRS § 658–9(a)(4) "arbitrators exceeding their powers" and argues, for the first time on November 9, 2004, that [the arbitrator] exceeded his powers when correcting the original award[.] A motion under HRS § 658–9 to vacate must be brought within 10 days after the award is rendered. *See* HRS § 658–11. Dawson's motion to vacate based upon HRS § 658–9(a)(4) is, therefore, too late.

[2.] ... Dawson is judicially estopped [from] mak[ing] th[e above] argument. After having moved in the arbitration pro-

ceedings pursuant to [DPRAR] Rule 31 to change the [amended] award, and after the [a]rbitrator then considered and decided Dawson's motion, Dawson cannot be heard to complain that the [a]rbitrator lacks the power to consider and decide whether to correct his award.

[3.] This [c]ourt, by virtue of [the June 2, 2004 order] already determined that [the arbitrator] did have jurisdiction and power to consider UPW's motion to correct the original award. That [o]rder is law of the case. The [c]ourt should reject Dawson's efforts to have th[e c]ourt belatedly reconsider the prior [o]rder.

Notwithstanding the above, UPW also contended that the arbitrator did not exceed his authority because, under DPRAR Rule 31, the arbitrator is permitted to correct an evident mathematical miscalculation in the award and that the circuit court specifically remanded the matter to the arbitrator for determination. UPW further maintained that the arbitrator's correction of the original award did not constitute a reopening of the arbitration proceedings.

A hearing was held on the parties' motions on November 17, 2004. In its written order, issued on January 6, 2005, the circuit court granted UPW's motion to confirm and denied Dawson's motion to vacate, concluding that "[t]he previous [j]udge had already issued a ruling[,] remanding this matter to the [a]rbitrator to correct or modify the award. There being no cogent reasons to overturn the previous [j]udge's ruling, this [c]ourt finds that the [a]rbitrator did not exceed his scope of authority." On the same day, the circuit court entered judgment in favor of UPW and against Dawson in the amount of $189,924.00. On February 7, 2005, Dawson timely filed its notice of appeal.

## II. *STANDARDS OF REVIEW*

A. *Arbitration*

 It is well established that this court has "confined judicial review of arbitration awards to the strictest possible limits." *Mars Constructors, Inc. v. Tropical Enters.,* 51 Haw. 332, 335, 460 P.2d 317, 319 (1969). This is because "of the legisla-

tive policy encouraging arbitration and thereby discouraging litigation." *Gadd v. Kelley*, 66 Haw. 431, 441, 667 P.2d 251, 258 (1983) (citing *Mars Constructors*, 51 Haw. at 336, 460 P.2d at 319). *See also Mathewson v. Aloha Airlines, Inc.*, 82 Hawai'i 57, 69, 919 P.2d 969, 981 (1996). Thus, "review of arbitration awards by the circuit and appellate courts is limited by the provisions of the arbitration statute." *Mars Constructors*, 51 Haw. at 335, 460 P.2d at 319. *See Kalawaia v. AIG Hawai'i Ins. Co.*, 90 Hawai'i 167, 173, 977 P.2d 175, 181 (1999); [*Jeffers* ], 73 Haw. [at] 204, 830 P.2d [at] 507[.]

*Gepaya v. State Farm Mut. Auto. Ins. Co.*, 94 Hawai'i 362, 365, 14 P.3d 1043, 1046 (2000) (internal brackets and ellipsis omitted). Further, "[w]e review the circuit court's ruling on an arbitration award *de novo*, but we also are mindful that the circuit court's review of arbitral awards must be extremely narrow and exceedingly deferential." *Tatibouet v. Ellsworth*, 99 Hawai'i 226, 233, 54 P.3d 397, 404 (2002) (internal brackets, quotation marks, and citations omitted).

### B. *Statutory Interpretation*

■ "The standard of review for statutory construction is well-settled. The interpretation of a statute is a question of law which this court reviews *de novo.*" *Liberty Mut. Fire Ins. Co. v. Dennison*, 108 Hawai'i 380, 384, 120 P.3d 1115, 1119 (2005) (quoting *Labrador v. Liberty Mut. Group*, 103 Hawai'i 206, 211, 81 P.3d 386, 391 (2003)) (internal quotation marks omitted).

### III. *DISCUSSION*

On appeal, Dawson specifically argues that the circuit court erred in remanding UPW's motion to modify because: (1) the court did not have the authority to delegate to the arbitrator the decision regarding UPW's motion to modify under HRS § 658–10; (2) the court did not make the requisite factual finding that the original award was patently ambiguous prior to its remand to the arbitrator; and (3) the basis for modification did not meet the definition of "evident miscalculation of figures" contained in HRS § 658–10(1), quoted *infra.* Dawson further contends that

the circuit court erred in (1) not finding that the arbitrator exceeded his jurisdiction under Hawai'i's judicially created exception to the *functus officio* doctrine, (2) concluding that there were no cogent reasons to overturn the previous decision to remand UPW's motion to modify, and (3) not vacating the amended award where the arbitrator exceeded his powers and acted in manifest disregard of the law and in violation of public policy by (a) treating mitigation of damages as an affirmative claim, as opposed to an affirmative defense, and (b) manifestly disregarding the law of contract damages, which prevents a breaching party from recovering damages against a party who was not in breach and who was not otherwise found liable for damages on any affirmative claims. Inasmuch as Dawson's contentions are premised on its belief that HRS chapter 658—and not HRS chapter 658A—applies to the instant case, we must first decide whether the old or new arbitration law govern the instant case.

### A. *The Applicability of HRS Chapter 658 Versus HRS Chapter 658A*

#### 1. **The Enactment of Chapter 658A**

In 2001, HRS chapter 658 was replaced by a modified version of the Uniform Arbitration Act. 2001 Haw. Sess. L. Act 265, §§ 5, 8 at 820. As originally promulgated, HRS § 658A–3 (Supp.2001) specifically provided that:

> **When chapter applies.** (a) Except as provided in subsection (c), this chapter governs an agreement to arbitrate made on or after July 1, 2002.
>
> (b) This chapter governs an agreement to arbitrate made before July 1, 2002, if all the parties to the agreement or to the arbitration proceeding so agree in a record.
>
> (c) After June 30, 2004, this chapter governs an agreement to arbitrate whenever made.

(Bold emphasis in original.) In 2002, the legislature amended HRS § 658A–3 by adding an additional sentence to subsection 3(b), which provides that:

> If the parties to the agreement or to the arbitration do not so agree in a record, an

agreement to arbitrate that is made before July 1, 2002, shall be governed by the law specified in the agreement to arbitrate or, if none is specified, by the state law in effect on the date when the arbitration began or on June 30, 2002, whichever first occurred.

2002 Haw. Sess. L. Act. 50, § 1 at 186. In amending subsection 3(b), the legislature specifically stated that:

The purpose of this measure is to clarify the applicability of the State's Revised Uniform Arbitration Act, codified last year as Chapter 658A[.]

. . . .

Your Committee finds that the measure addresses an omission in the Revised Uniform Arbitration Act which governs arbitration agreements made prior to the effective date of Chapter 658A, HRS, if agreed to by the parties to the agreement or to the arbitration proceeding. However, the Revised Uniform Arbitration Act is silent as to which law governs if the parties do not agree. This measure will enable the use of the provision in the previous arbitration law, which has since been repealed, when warranted.

Sen. Stand. Comm. Rep. No. 3169, in 2002 Senate Journal, at 1511; *see also* Sen. Stand. Comm. Rep. No. 2850, in 2002 Senate Journal, at 1378–79; Hse. Stand Comm. Rep. No. 260, in 2002 House Journal, at 1331.[15] Accordingly, the current version of HRS § 658A–3 (Supp.2005) provides in its entirety:

**When chapter applies.** (a) Except as provided in subsection (c), this chapter governs an agreement to arbitrate made on or after July 1, 2002.

(b) This chapter governs an agreement to arbitrate made before July 1, 2002, if all the parties to the agreement or to the arbitration proceeding so agree in *a* record. If the parties to the agreement or to the arbitration do not so agree in a record, an agreement to arbitrate that is made before July 1, 2002, shall be governed by the law specified in the agreement to arbi-

trate or, if none is specified, by the state law in effect on the date when the arbitration began or on June 30, 2002, whichever first occurred.

(c) After June 30, 2004, this chapter governs an agreement to arbitrate whenever made.

(Bold emphasis in original.)

■ We have repeatedly announced that: In construing statutes, a court's primary objective is to ascertain and give effect to the intention of the legislature as gleaned primarily from the language contained in the statute itself. Accordingly, it is well settled that this court is bound by the plain, clear[,] and unambiguous language of a statute[,] unless the literal construction would produce an absurd and unjust result, and would be clearly inconsistent with the purposes and policies of the statute.

*CARL Corp. v. State of Hawai'i, Dep't of Educ.,* 85 Hawai'i 431, 459, 946 P.2d 1, 29 (1997) (internal quotation marks, ellipses, original brackets, and citations omitted) (format altered). Furthermore, "we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose." *Courbat v. Dahana Ranch, Inc.,* 111 Hawai'i 254, 260, 141 P.3d 427, 433 (2006) (citations omitted). Bearing the foregoing principles in mind, we now examine the language of HRS § 658A–3 as it applies to the instant case.

### 2. The Application of HRS § 658A–3(a) to the Instant Case

■ Subsection 3(a) clearly directs that, "except as provided in subsection (c)," *see* section III.A.4., *infra,* the new chapter "governs an agreement to arbitrate made *on or after July 1, 2002.*" HRS § 658A–3(a) (emphasis added). Here, it is undisputed that (1) UPW and Dawson entered into the Plan Agreement, which contained the dispute resolution provisions, on February 24, 2000, prior to the enactment of HRS chapter 658A and (2) UPW and Dawson executed the DPR

---

**15.** Specifically, the amendment to HRS § 658A–3 was considered by the committees of Judiciary and Hawaiian Affairs, Judiciary, and Labor.

Arbitration Agreement on August 23, 2003 and January 30, 2004, respectively, which agreement explicitly provides that "[t]he parties, DPR, and James Paul, Esq. agree to follow and abide by the DPR Arbitration Rules[.]" Further, the parties do not dispute that, prior to Dawson's signing of the DPR Arbitration Agreement on January 30, 2004, they conducted discovery under the old arbitration law.[16]

On appeal, Dawson maintains that HRS chapter 658 is applicable inasmuch as the Plan Agreement was entered into prior to the enactment of HRS chapter 658A. Specifically, Dawson argues that the DPR Arbitration Agreement does not contain language that expressly alters the statutory jurisdiction that the parties have followed since the commencement of the arbitration proceeding and throughout the discovery period. Dawson maintains that:

When it signed [the DPR Arbitration Agreement,] to pay fees, [Dawson] had no intention of changing the statutory jurisdiction of the [a]rbitrator or abandoning the version of the DPR[AR] that the parties and the arbitrator were following up until that time. Moreover, the statements made by UPW's counsel after UPW signed the DPR form acknowledge that the proceedings were under Chapter 658 and acknowledge that the only arbitration agreement between the parties that matters is the one contained in the Plan [Agreement]. UPW goes so far as to state that DPR's agreement is just a "formality" to provide "additional protections for [the] DPR" related to responsibility for paying [the] DPR and the [a]rbitrator.

(Footnote omitted.) In sum, Dawson essentially maintains that the DPR Arbitration Agreement does not constitute a new and enforceable arbitration agreement nor displaces or overrides the dispute resolution provisions of the Plan Agreement.

Conversely, UPW argues that, when Dawson signed the DPR Arbitration Agreement on January 30, 2004, it agreed to be bound by the DPRAR, including DPRAR Rule 31.

At that time, Rule 31 provided that: "Parties may apply to the Arbitrator(s) to modify, correct or clarify an Award, pursuant to the procedures specified in the RUAA, Section 20[, i.e., HRS § 658A–20]." HRS § 658A–20 expressly permits the arbitrator to act on a party's request to make mathematical corrections or clarify an arbitration award. Consequently, UPW contends that "Dawson's argument that it is somehow not bound by [the DPRAR] flies in the face of its express agreement to the contrary when signing [the DPR Arbitration Agreement]." UPW further contends that:

Dawson's extrinsic evidence of alleged secret undocumented intentions of Dawson when signing the DPR [Arbitration] Agreement [is] not supported by the record (no affidavit by Dawson) and were properly not considered by the circuit court. The plain language of the [DPR] Arbitration Agreement controls over what Dawson may have secretly intended when it signed the agreement.

Based upon the respective positions of the parties, the inquiry is whether the DPR Arbitration Agreement constitutes a new valid and enforceable agreement to arbitrate, thereby, superseding the dispute resolution provisions of the Plan Agreement and triggering the applicability of HRS chapter 658A.

 Preliminarily, we recognize the well-settled principle that

courts should not draw inferences from a contract regarding the parties' intent when the contract is definite and unambiguous. In fact, contractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech. The court should look no further than the four corners of the document to determine whether an ambiguity exists.

*State Farm Fire & Cas. Co. v. Pac. Rent–All Inc.*, 90 Hawai'i 315, 324, 978 P.2d 753, 762 (1999) (citations omitted). Where a writing is found to be clear and unambiguous and "represents the final and complete agree-

---

16. In UPW's letter to the arbitrator, dated September 8, 2003, concerning certain discovery issues, UPW conceded that "the old arbitration statute, HRS chapter 658, as opposed to the new arbitration statute, Chapter 658A, should apply."

ment of the parties," the parol evidence rule bars evidence "of prior contemporaneous negotiations and agreements that vary or alter the terms of a written instrument." *Id.* (citation omitted). Thus, "[o]nce the parties execute an instrument which contains their whole agreement, their previous negotiations and agreements are legally ineffective and evidence relating to those previous negotiations or agreements is irrelevant regardless of who offers it." *Akamine & Sons, Ltd. v. Am. Sec. Bank,* 50 Haw. 304, 310, 440 P.2d 262, 266 (1968).

 However, it is equally well-settled that, because the parol evidence rule presupposes a valid agreement, it will not prohibit evidence showing that there was no agreement or no enforceable agreement. *See* E. Allan Farnsworth, Contracts §§ 7.3–7.4, at 239–47 (3d ed.2004);[17] *see also* 11 Williston on Contracts, § 33:17 at 632–40 (4th ed.1999); Restatement (Second) of Contracts § 210, cmt. b (1981) ("[A] writing cannot of itself provide its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties."). In other words, the parol evidence rule "only applies to enforceable contracts and thus extrinsic evidence should be considered in assessing defenses to contract formation." *Boskoff v. Yano,* 217 F.Supp.2d 1077, 1086 (D.Haw.2001) (citation omitted); *see also State Farm Fire & Cas. Co.,* 90 Hawai'i at 324, 978 P.2d at 762 ("absent fraud, duress, mistake or ambiguity, extrinsic evidence is excluded *once it is determined that a contract is fully integrated*") (citations omitted) (emphasis added); *Local Motion, Inc. v. Niescher,* 105 F.3d 1278, 1280 (9th Cir.1997) (the rule "only applies when the court is interpreting a contract that is enforceable") (citation omitted).

 Intrinsic to finding the existence of an agreement is finding the intention of

the parties. "It is an elementary rule of contract law that there must be a meeting of the minds on all essential elements or terms in order to create a binding contract[.]" *Moss v. Am. Int'l Adjustment Co.,* 86 Hawai'i 59, 63, 947 P.2d 371, 375 (1997) (citation, internal quotation marks, and original brackets omitted) (holding that the parties failed to enter into a binding arbitration agreement because there was no meeting of the minds); *see also S. Foods Group, L.P. v. State of Hawai'i, Dep't of Educ.,* 89 Hawai'i 443, 457, 974 P.2d 1033, 1047 (1999) ("[C]ontracting is a sentient process. There must be objective proof of a meeting of the minds. The prospective contracting parties are not expected to engage in telepathy. There must be a confluence of assent around specific terms." (Citation omitted.)).

The existence of mutual assent or intent to accept is determined by an objective standard. A party's words or acts are judged under a standard of reasonableness in determining whether he has manifested an objective intention to agree. All reasonable meanings will be imputed as representative of a party's corresponding objective intention. Unexpressed intentions are nugatory when the problem is to ascertain the legal relations, if any, between two parties.

*Earl M. Jorgensen Co. v. Mark Constr., Inc.,* 56 Haw. 466, 470–71, 540 P.2d 978, 982 (1975) (citations omitted). It follows then that, "[a]n arbitration agreement, like any contract, must be construed to give effect to the intention of the parties." *Wayland Lum Constr., Inc. v. Kaneshige,* 90 Hawai'i 417, 422, 978 P.2d 855, 860 (1999) (citation omitted).

In our view, the record on appeal in the instant case evinces that there was no "meeting of the minds" between the parties to create a new binding contract to arbitrate

---

17. Section 7.4 provides in relevant part:
 If the parol evidence rule rests on the rationale that a latter written agreement has supplanted prior negotiations, it follows that the rule does not come into play until the existence of an enforceable written agreement has been shown. Evidence of the negotiations between the parties should therefore be admissible to show that no agreement was reached or that

the agreement reached was invalid. The parol evidence rule does not speak to these questions.
*Id.* § 7.4, at 240 (footnotes omitted); *see also id.* § 7.3, at 239 ("[S]ince the rule assumes a valid written agreement, it does not exclude evidence to show that there was no agreement or that the agreement was invalid." (Footnote omitted.)).

that would replace or supersede the dispute resolution provisions contained in the Plan Agreement. UPW, in a letter dated January 27, 2004 to the DPR regarding Dawson's failure to make the $6,000.00 initial deposit for the arbitration proceedings, expressly maintained that:

> As to Dawson's failure to sign the Agreement to Participate in Binding Arbitration, we respectfully assert that Dawson's signature is but **a mere formality and is not necessary in order to go forward.** Dawson originally initiated this arbitration back in 2001, and, thereafter, has since participated by selecting the arbitrator, submitting a Statement of Claim, submitting an Answer to UPW's Statement of the Case, exchanging documents responsive to discovery requests, and appearing/arguing in several scheduling and discovery telephone conferences with Arbitrator Jim Paul. Please note also that Dawson already signed the underlying contract at issue in this matter which included Dawson's agreement to resolve any contract disputes with UPW through arbitration. **That arbitration provision was the basis for initiating these arbitration proceedings with DPR. Under these circumstances, Dawson is already bound by an arbitration agreement and** its conduct to date, other than its refusal to pre-pay its share, certainly constitutes an agreement to participate in this arbitration. [The DPR Arbitration Agreement] merely provides additional protection for DPR's and the arbitrator's fees, but is now unnecessary because UPW is willing to advance all of these fees.

(Emphases added.) Thereafter, on January 30, 2004, Dawson signed the DPR Arbitration Agreement.

Under these circumstances, it cannot reasonably be said that Dawson "manifested an objective intention to agree," *Earl M. Jorgensen Co.*, 56 Haw. at 470, 540 P.2d at 982, that the DPR Arbitration Agreement constituted a *new* agreement to arbitrate. *See* Restatement (Second) of Contracts § 20 ("There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and (a) neither party knows or has reason to know the meaning attached by the other; or (b) each party knows or each party has reason to know the meaning attached by the other."). Moreover, UPW's statements in its January 27, 2004 letter that (1) "Dawson already signed the underlying contract," (2) the "arbitration provision [in that contract] was the basis for initiating these arbitration proceedings with DPR," and (3) "Dawson is already bound by an arbitration agreement" demonstrate that UPW, itself, did not consider the DPR Arbitration Agreement as a new agreement to arbitrate that would displace the dispute resolution provisions of "the underlying contract," *i.e.*, the Plan Agreement.

Rather, we believe the DPR Arbitration Agreement complied with section 5.03 of the Plan Agreement. As previously quoted, section 5.03 sets forth the parties' agreement to arbitrate any disputes and also provides that "the parties shall select an Arbitrator by mutual agreement." The DPR Arbitration Agreement clearly evinces the parties' mutual assent to (1) James Paul, Esq. as their arbitrator, (2) the scope of the arbitrator's authority in determining the dispute, and (3) the arbitrator's compensation and expenses. In other words, the DPR Arbitration Agreement merely memorializes, in writing, the parties "mutual agreement" regarding the selection of an arbitrator, as required by section 5.03 of the Plan Agreement. Indeed, as UPW's letter of January 27, 2004 indicates, "Dawson is *already* bound by an arbitration agreement [ (*i.e.*, section 5.03 of the Plan Agreement),]" and, therefore, the post-July 1, 2002 DPR Arbitration Agreement is not a "new" arbitration agreement that would dictate the application of HRS chapter 658A to the arbitration proceedings. Accordingly, inasmuch as the Plan Agreement was executed on February 24, 2000, HRS § 658A–3(a) is inapplicable to the instant case. *See also* section III.A.4., *infra*.

### 3. The Application of HRS § 658A–3(b) to the Instant Case

■ The fact that the Plan Agreement was executed prior to July 1, 2002, however, does not necessarily foreclose the application of the new arbitration law—HRS chapter

658A—to the instant case under HRS § 658A–3(b), quoted *supra.* Based on the first sentence of subsection 3(b), the new chapter may govern an arbitration agreement made *before* July 1, 2002, as long as the parties to the agreement or the proceedings "so agree *in a record."* HRS § 658A–3(b) (emphasis added). If the parties cannot agree, the second sentence of subsection 3(b) states that the law specified in the agreement shall govern; but, if no governing law is specified in the agreement, the arbitration shall be governed by the law in effect "on the date when *the arbitration began* or on *June 30, 2002, whichever occurred first."* HRS § 658A–3(b) (emphases added).

As previously stated, UPW maintains that, by signing the DPR Arbitration Agreement, Dawson agreed to be bound by the DPRAR, which references HRS chapter 658A and that, therefore, the DPR Arbitration Agreement is the "record" for purposes of subsection 3(b). However, notwithstanding the fact that the parties agreed to "follow and abide" by the DPRAR, the DPR Arbitration Agreement does not specifically reference which version of the DPRAR would be followed, *i.e.,* those promulgated during the time when HRS chapter 658 was effective or those promulgated after the effective date of HRS chapter 658A. We, therefore, reject UPW's argument that the DPR Arbitration Agreement is the "record" evincing the parties' agreement that the new arbitration law would apply to the arbitration proceeding.

 In the absence of an agreement by the parties "in a record" to the application of HRS chapter 658A, the second sentence of subsection 3(b) mandates the governing law to be that which is "specified in the *agreement to arbitrate* or, if none is specified, by the state law in effect on the date *when the arbitration began* or *on June 30, 2002, whichever first occurred."* HRS § 658A–3(b) (emphases added). As previously discussed, the DPR Arbitration Agreement is not a new agreement to arbitrate; thus, the Plan Agreement entered into on February

24, 2000 controls. The dispute resolution provisions of the Plan Agreement, however, do not specify or make reference to the law that would govern an arbitration proceeding pursuant to the Plan Agreement. Thus, we look to the alternative enunciated in the second sentence of subsection 3(b), *i.e.,* the date when the arbitration began. The arbitration proceeding in the instant case commenced on February 18, 2004—after June 30, 2002. Consequently, pursuant to the plain reading of the alternative stated in the second sentence of HRS § 658A–3(b), the governing law is that which was in effect on June 30, 2002, *i.e.,* HRS chapter 658.[18]

### 4. The Application of HRS § 658A–3(c) to the Instant Case

 As previously stated, HRS § 658A–3(a) provides that the new arbitration law applies to all agreements entered into after July 1, 2002 "except as provided in subsection (c)." Subsection 3(c) provides that, after June 30, 2004, the new arbitration law "governs an agreement to arbitration *whenever made."* HRS § 658A–3(c) (emphasis added). In other words, a plain reading of subsection 3(c) indicates that, after June 30, 2004, HRS chapter 658A applies whether an arbitration agreement was made before or after July 1, 2002. However, being mindful that "we must read statutory language in the context of the entire statute," *Courbat,* 111 Hawai'i at 260, 141 P.3d at 433, we must examine the apparent conflict between HRS §§ 658A–3(b) and –3(c).

 Under subsection 3(c), after June 30, 2004, the new arbitration law would apply regardless whether an arbitration proceeding may be ongoing. In other words, in cases where a pre-July 1, 2002 arbitration agreement did not specify the governing law and the arbitration began at any time between July 1, 2002 and June 30, 2004, the second sentence of subsection 3(b) controls, that is, the old arbitration law would apply because June 30, 2002 occurred first; but, if the proceeding is not completed by June 30,

---

**18.** Moreover, by signing the DPR Arbitration Agreement, Dawson agreed to "follow and abide" by the DPRAR. However, as previously discussed, the DPR Arbitration Agreement does not specify which version of the DPRAR would be applicable. Consequently, the alternative enunciated in the second sentence of subsection 3(b) is triggered.

2004, the new arbitration law is triggered on July 1, 2004. However, inasmuch as "a rational, sensible, and practicable interpretation of a statute is preferred to one which is unreasonable or impracticable," *Kinkaid v. Bd. of Review of City & County of Honolulu*, 106 Hawai'i 318, 323, 104 P.3d 905, 910 (2004) (internal quotation marks, brackets, and citation omitted), we presume that the legislature would not have intended the absurd result of having parties to an arbitration be subjected to a change of rules while in the midst of an ongoing arbitration proceeding. *See id.* (stating that "the legislature must be presumed not to intend an absurd result, such that legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality" (internal quotation marks, brackets, and citation omitted)). Changing the rules mid-stream could impact prior rulings made by the arbitrator under a different scheme, cause confusion, create delays, and increase the expenses of the parties. Such a result would be inconsistent with the general proposition that "parties resort to arbitration to settle disputes more expeditiously and inexpensively than by a court action[.]" *Daiichi Hawai'i Real Estate Corp. v. Lichter*, 103 Hawai'i 325, 339, 82 P.3d 411, 425 (2003) (citation omitted). Indeed, it would also be inconsistent with the purposes of the Uniform Arbitration Act. *See* Sen. Stand. Comm. Rep. No. 1467, in 2002 Senate Journal, at 1514 ("Your Committee

finds that arbitration is a desirable alternative to litigation. Your Committee believes that this bill will facilitate arbitration as an effective means of resolving contractual disputes without the need for litigation by augmenting procedures to meet modern needs."); Sen. Stand. Comm. Rep. No. 1248, in 2002 Senate Journal, at 1420 ("Your Committee finds that arbitration has become a more viable alternative to litigation."). Thus, in our view, "the rationale, sensible, and practicable interpretation" of HRS § 658A-3(c) is that it does not apply to an ongoing arbitration proceeding, but to arbitration proceedings commenced after June 30, 2004. Stated differently, under subsection 3(c), arbitration proceedings commenced after June 30, 2004 are governed by the new arbitration law regardless of when the arbitration agreement was made. Accordingly, inasmuch as the arbitration proceeding in this case commenced prior to June 30, 2004, HRS § 658A-3(c) is inapplicable to the instant case. Consequently, we hold that, under the circumstances of this case and the plain language of HRS § 658A-3(b), the governing law applicable to the arbitration proceeding in this case is HRS chapter 658.[19]

▄▄▄▄ We now turn to the dispositive issue on appeal—whether the circuit court's remand to the arbitrator was proper under Chapter 658.[20]

19. The dissent concludes that the DPR Arbitration Agreement is (1) an agreement to arbitrate made after July 1, 2002 under HRS § 648A-3(a) and (2) a "record" that dictates the application of HRS chapter 658A pursuant to HRS § 658A-3(b). According to the dissent, "[r]egardless of what Dawson's subjective intent or UPW's may have been *prior* to the execution, once the DPR Arbitration Agreement was signed ... by UPW and Dawson ..., there plainly was a meeting of the minds manifested by the instrument. The DPR Arbitration Agreement constituted an express manifestation of the parties' 'agreement to arbitrate' under its terms." (Citation omitted.) (Emphasis in original.) We, however, cannot agree with the dissent's contention. To conclude, as the dissent does, that the parties' mere execution of the DPR Arbitration Agreement created a new and valid agreement to arbitrate would violate the "elementary rule of contract law that[, in order to create a binding agreement,] there must be a meeting of the minds" as to the essential terms. *Moss*, 86 Hawai'i at 63, 947 P.2d at 375 (citation and internal quotation

marks omitted). As previously discussed, there was no meeting of the minds between Dawson and UPW with respect to the essential term that the DPR Arbitration Agreement constituted a **new** agreement to arbitrate. The critical question, in this case, is whether the DPR Arbitration Agreement constitutes a new valid and enforceable agreement to arbitrate, thereby superseding the dispute resolution provisions in the Plan Agreement, and triggering the application of HRS chapter 658A. In answering the critical question, courts are permitted, as discussed *supra*, to resort to extrinsic evidence, *e.g.*, the January 27, 2004 letter, which clearly demonstrates that the parties did not intend to create a **new** agreement to arbitrate.

20. UPW asserts that Dawson should have appealed the circuit court's June 2, 2004 remand order within thirty days because such order was analogous to an order compelling arbitration on the evident mathematical miscalculation issue and that, therefore, Dawson's challenge on appeal is untimely. However, UPW does not provide any

### B. The Propriety of the Circuit Court's Remand to the Arbitrator Under HRS Chapter 658

Initially, we note that, in remanding the matter to the arbitrator, the circuit court specifically indicated it was "persuaded by the argument and the authorities cited by UPW," which cited-authority included HRS § 658A–20. However, inasmuch as we have held that HRS chapter 658A does not govern this case, UPW's arguments based upon HRS chapter 658A are inapplicable. We must, nevertheless, examine whether the circuit court's remand order was authorized under HRS chapter 658 and, therefore, the following discussion is limited to the parties' arguments as they relate to HRS chapter 658 and not chapter 658A.[21] However, as previously stated, Dawson, in entering into the October 18, 2004 stipulation, clearly reserved its right to pursue "any claims, defenses or positions with respect to prior proceedings and decisions." In other words, the stipulation—as Dawson's counsel pointed out—

"only . . . applied prospectively." Thus, UPW's judicial estoppel argument is without merit.

Dawson argues that "[t]here is nothing in Chapter 658 . . . that gives the [circuit c]ourt authority to delegate to the [a]rbitrator its statutory jurisdiction and authority to modify an award under HRS § 658–10." UPW, on the other hand, contends that, even under the old arbitration law, the circuit court has the power to remand the award to the arbitrator under the well-recognized common law exception to *functus officio*, which permits the arbitrator to review the award upon instructions from the court.

We have previously stated in the context of HRS chapter 658 that "[t]he [circuit] court cannot act except as allowed by that [c]hapter." *Bateman Constr., Inc. v. Haitsuka Bros.*, 77 Hawai'i 481, 484, 889 P.2d 58, 61 (1995). In that regard, HRS § 658–8 mandates that the circuit courts "shall grant . . . an order [confirming an arbitration award]

---

authority for the proposition that the remand to the arbitrator for recalculation of damages is an appealable order similar to an order to compel arbitration. We note that HRS § 658–12 (1993) provides that:

Upon the granting of an order, confirming, modifying, or correcting an award, the same shall be filed in the office of the clerk of the circuit court and this shall constitute the entry of judgment. *An appeal may be taken from such judgment as hereinafter set forth.*

(Emphasis added.) HRS § 658–15 (1993) indicates that:

Unless the agreement for award provides that no appeal may be taken[,] *an appeal may be taken from an order vacating an award, or from a judgment entered upon an award, as from an order or judgment in an action, otherwise no appeal may be had.*

(Emphasis added.) Moreover, this court has previously held that an appeal from a final judgment "brings up for review all interlocutory orders not appealable directly as of right which deal with issues in the case." *Ueoka v. Szymanski*, 107 Hawai'i 386, 396, 114 P.3d 892, 902 (2005) (internal quotation marks and citation omitted). Here, the circuit court's final judgment confirming the amended arbitration award "brings up for review [the circuit court's remand order that was] not appealable directly as of right[.]" *Id.* at 396, 114 P.3d at 902 (internal quotation marks and citation omitted); *see also Salud v. Fin. Sec. Ins. Co.*, 69 Haw. 427, 431, 745 P.2d 290, 293 (1987) (orders denying vacation, modification or correction of an arbitration award, though not themselves appealable under HRS chapter 658,

are reviewable on appeal from an order confirming the award). Consequently, UPW's untimeliness argument is without merit.

21. We note that UPW also argues that Dawson is judicially estopped from challenging (1) the circuit court's authority to remand the matter to the arbitrator and (2) the arbitrator's power to correct the original award, based upon the October 18, 2004 stipulation, wherein the parties agreed to the arbitrator's jurisdiction to consider and decide Dawson's motion to modify the amended arbitration award. Specifically, UPW contends that

only after Dawson moved and then stipulated that [the arbitrator] had the power to consider Dawson's own motion to [modify] the [amended award] and then [the arbitrator] denied Dawson's motion, did Dawson claim that [the arbitrator] lacked power to correct [the original] award in the first place. . . . Dawson is judicially estopped to invoke [the arbitrator's] power and then to claim he has no such power. . . . [Thus,] Dawson cannot be heard to complain that [the arbitrator] lacks the power to consider and decide whether to correct [the original] award.

However, as previously stated, Dawson, in entering into the October 18, 2004 stipulation, clearly reserved its right to pursue "any claims, defenses or positions with respect to prior proceedings and decisions." In other words, the stipulation—as Dawson's counsel pointed out—"only . . . applied prospectively." Thus, UPW's judicial estoppel argument is without merit.

unless the award is vacated, modified, or corrected, as prescribed in sections 658–9 and 658–10." HRS § 658–8; *see also Morrison–Knudsen Co. v. Makahuena Corp.*, 66 Haw. 663, 672, 675 P.2d 760, 767 (1983) ("HRS § 658–8 contemplates a judicial confirmation of the award issued by the arbitrator, unless the award is vacated, modified, or corrected in accord with HRS §§ 658–9 and 658–10." (Internal citation and quotation marks omitted.)). We have also stated that "HRS § 658–9 provides only four specific grounds upon which an award can be vacated, while HRS § 658–10 provides only three grounds for modifying or correcting an award." *Labrador v. Liberty Mut. Group*, 103 Hawai'i 206, 212, 81 P.3d 386, 392 (2003) (footnote, citation, and internal quotation marks omitted). Under HRS § 658–9, the four specific grounds for vacating an award are:

(1) Where the award was procured by corruption, fraud, or undue means;

(2) Where there was evident partiality or corruption in the arbitrators, or any of them;

(3) Where the arbitrators were guilty of misconduct, in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence, pertinent and material to the controversy; or of any other misbehavior, by which the rights of any party have been prejudiced;

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award, upon the subject matter submitted, was not made.

And, under HRS § 658–10, the three grounds for modifying or correcting an award are:

(1) Where there was an evident miscalculation of figures, or an evident mistake in the description of any person, thing, or property, referred to in the award;

(2) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matters submitted;

(3) Where the award is imperfect in a matter of form, not affecting the merits of the controversy.

Clearly, none of the above enumerated grounds includes the authority to remand the award to the arbitrator for any purpose, let alone remanding for a determination whether modification of the original award is warranted.

Moreover, as previously noted,

*[w]hen an award has been made, the authority of the arbitrator comes to an end.* He becomes *functus officio*. Under general principles of arbitration law[,] he cannot in any way change or explain his award *unless* his authority is reinstated in writing by all parties, or **the matter is returned to him by the appropriate court.**

*Jeffers*, 73 Haw. at 207, 830 P.2d at 507 (format altered) (citation omitted) (emphases added). The authority of "the appropriate court" to return a case to the arbitrator, however, is limited.

In *Labrador*, this court acknowledged two judicially recognized exceptions to confirmation: "*one, to allow remand to the arbitrator to clarify an ambiguous award;* an[d] another, to allow vacation of an arbitration award clearly violative of public policy." 103 Hawai'i at 212, 81 P.3d at 392 (citation and internal quotation marks omitted) (emphases added). Thus, remand to the arbitrator by the circuit court would be proper where an ambiguous arbitration award requires clarification. "Clarification" of an ambiguous award, however, is distinguishable from a court's vacation, modification, or correction of an award in that "the *clarification* [can]not ... change[ ] the amount of the award." *Jeffers*, 73 Haw. at 214, 830 P.2d at 511 (emphasis added) (holding that the appellees in *Jeffers* were actually seeking a modification or correction of the award "in the guise of a clarification" because the requested clarification would "substantially change the amounts the parties could receive from [the appellants]").

In the instant case, UPW concedes that the circuit court remanded the case to the arbitrator "to consider whether there was an evident mathematical miscalculation, not to clarify any ambiguity." Accordingly, by

UPW's own admission, the circuit court's remand does not fall within the judicially recognized exception of allowing remand for purposes of clarifying an ambiguous award that would not result in a substantial change in the amounts awarded.

■ In examining UPW's motion to modify, the circuit court is confined to acting only within the authority conferred by HRS §§ 658–9 and –10 and the judicially recognized exceptions set forth in *Labrador*. Inasmuch as the requisite finding of ambiguity was not made by the circuit court and, because HRS chapter 658 does not authorize the circuit court to remand the case to the arbitrator to modify or correct the award, we hold that, based on the circumstances of this case, the circuit court erred in remanding the matter to the arbitrator.[22]

### C. *Dawson's Remaining Contentions*

In light of our holding today, we need not address any of the remaining contentions raised by Dawson.

### IV. CONCLUSION

Based on the foregoing, we vacate the circuit court's January 6, 2005 final judgment and remand this case for further proceedings consistent with this opinion.

### Dissenting Opinion by ACOBA, J.

I must respectfully disagree with the majority because the plain language of Hawai'i Revised Statutes (HRS) § 658A–3 (Supp. 2005)[1] dictates that HRS chapter 658A governs inasmuch as (1) under HRS § 658A–3(a), the January 30, 2004 Dispute Prevention & Resolution, Inc. (DPR) "Agreement to Participate in Binding Arbitration" (DPR Arbitration Agreement) is an "agreement to arbitrate" made after July 1, 2002, (2) moreover, pursuant to HRS § 658A–3(b), the DPR Arbitration Agreement may be considered a "record" in which the parties agreed that HRS chapter 658A should govern with respect to the February 24, 2000 two-year

---

**22.** In support of its assertion that the circuit court has the power to remand the matter to the arbitrator, UPW relies upon several federal cases interpreting HRS § 658–10's counterpart, *i.e.*, section 11 of the Federal Arbitration Act (FAA). Section 11(a) permits the federal district court to modify or correct an award "[w]here there was an evident material miscalculation of figures[.]" 9 U.S.C.A. § 11(a). UPW argues that *Laurin Tankers America, Inc. v. Stolt Tankers, Inc.*, 36 F.Supp.2d 645 (S.D.N.Y.1999), *Weinberg v. Silber*, 140 F.Supp.2d 712 (N.D.Tex.2001), and *Saxis Steamship Co. v. Multifacs International Traders, Inc.*, 375 F.2d 577 (2d Cir.1967), stand for the proposition that, even though the FAA does not contain any provisions dealing with remand of arbitration awards to the arbitrator, the courts have remanded the award to the arbitrator to correct an evident miscalculation of figures. These cases, however, do not support UPW's contentions and are readily distinguishable. In *Laurin Tankers America, Inc.*, the federal court indicated, prior to remanding the matter to the arbitrator, that the miscalculation issue "goes squarely to the merits of the parties' dispute, and resolution of the merits is for the arbitrators, not for the [c]ourt." 36 F.Supp.2d at 652. In *Weinberg*, the court remanded the arbitration award to the arbitrator for clarification under the exception that ambiguous award may be remanded. 140 F.Supp.2d at 722–23. And, finally, the basis for the circuit court's remand in *Saxis* to allow the arbitrator to correct a mistake in the computation of the award is unclear. 375 F.2d at 581 n. 4. Nevertheless, it is well-recognized that courts are authorized to remand matters to

the arbitrators for clarification where the award is ambiguous. *See U.S. Energy Corp. v. Nukem, Inc.*, 400 F.3d 822 (10th Cir.2005) (setting forth a collection of cases from other circuits where remand to arbitrator for clarification of ambiguous awards was permitted); *see also Sterling China Co. v. Glass, Molders, Pottery, Plastics & Allied Workers Local 24*, 357 F.3d 546, 553 (6th Cir.2004). As previously discussed, the circuit court's remand to the arbitrator in this case was not authorized by HRS chapter 658 and was made without the requisite finding of ambiguity. Thus, the cases relied upon by UPW are inapposite.

**1.** HRS § 658A–3 (Supp.2005) entitled "When chapter applies," states as follows:

(a) Except as provided in subsection (c), *this chapter governs an agreement to arbitrate made on or after July 1, 2002.*

(b) This chapter *governs an agreement to arbitrate made before July 1, 2002, if all the parties* to the agreement or to the arbitration proceeding *so agree in a record.* If the parties to the agreement or to the arbitration do not so agree in a record, an agreement to arbitrate that is made before July 1, 2002, shall be governed by the law specified in the agreement to arbitrate or, if none is specified, by the state law in effect on the date when the arbitration began or on June 30, 2002, whichever first occurred.

(c) After June 30, 2004, this chapter governs an agreement to arbitrate whenever made. (Emphases added.)

contract for prepaid legal services (the Plan Agreement), and (3) in light of the foregoing, HRS § 658A–3(c) does not apply to this case. Accordingly, I would affirm the January 6, 2005 final judgment of the circuit court of the first circuit (the court) confirming an amended arbitration award in favor of applicant-appellee United Public Workers, AFSCME, Local 646, AFL–CIO (UPW).

## I.

In my view, the majority errs in concluding that the DPR Arbitration Agreement "evinces that there was no 'meeting of the minds' between the parties to create a new binding contract to arbitrate that would replace or supersede the dispute resolution provisions contained in the Plan Agreement." Majority op. at 509. To the contrary, the DPR Arbitration Agreement binds the parties to Rule 31 and Rule 35 of the "DPR Arbitration Rules, Procedures & Protocols" (DPR Arbitration Rules) incorporating the procedures of HRS chapter 658A. Thus, HRS chapter 658A rather than HRS chapter 658 must be applied in this case.

## II.

Under the February 24, 2000 Plan Agreement, respondent-appellant Dawson International, Inc. (Dawson) was to administer a prepaid legal services plan. As the majority notes, the Plan Agreement contained the following dispute resolution procedures:

5.01 Notice of Violation.

Should either party allege a violation of this Agreement, the party alleging the violation shall notify in writing the other party of the alleged violation within thirty (30) days of the alleged violation or within thirty (30) days of realizing the alleged violation.

5.02 Violation Resolution.

Should the violation not be resolved within thirty (30) days after notification of the violation[,] the resolution procedure as provided in Section 5.03 shall apply.

2. However, the Plan Agreement specifies, "This Agreement shall be governed by the laws of the

5.03 Resolution Procedure.

The parties shall submit the violation to mediation before resorting to arbitration. The mediator(s) shall be selected by mutual agreement of the parties. In the event the violation is not resolved in mediation[,] the violation shall be submitted to arbitration. *Within fifteen (15) days after the conclusion of mediation[,] the parties shall select an Arbitrator by mutual agreement.* Negotiations, mediation or arbitration shall be conducted on Oʻahu, Hawaiʻi.

Majority op. at 499 (emphasis added). The majority notes that "[t]he dispute resolution provisions of the Plan Agreement, however, do not specify or make reference to the law that would govern an arbitration proceeding pursuant to the Plan Agreement."[2] Majority op. at 511.

On January 27, 2004, after receiving notice from the DPR that the DPR intended to cancel the scheduled arbitration hearings arising out of the Plan Agreement because Dawson had failed to pay the arbitrator's anticipated fees of $6,000 and return a signed copy of the DPR Arbitration Agreement, UPW's counsel responded. UPW stated in its January 27, 2004 letter, "Despite that UPW has long since already paid its $6,000 share, UPW is willing to also pay Dawson's $6,000 share in order to keep the arbitration hearings in place· and to have this matter finally resolved." UPW stated further, "As for Dawson's failure to sign the [DPR Agreement], we respectfully assert that Dawson's signature is but a mere formality and is not necessary in order to go forward [with the arbitration]."

Nevertheless, Dawson subsequently executed the DPR Arbitration Agreement on January 30, 2004. The DPR Arbitration Agreement states in pertinent part as follows:

By agreement of the parties set forth below, Dispute Prevention & Resolution, Inc. (DPR)/James Paul, Esq. *have agreed to conduct a binding arbitration proceeding*

State of Hawaiʻi."

of the matters in controversy between the parties .... *The parties, DPR, and James Paul, Esq. agree to follow and abide by the DPR Arbitration Rules, Procedures & Protocols, as established by DPR.*

Unless the parties' agreement provides otherwise, the Arbitrator must determine all issues submitted to arbitration by the parties and may grant any and all remedies that the Arbitrator determines to be just and appropriate under the law.

(Emphases added.) Regardless of what Dawson's subjective intent or UPW's may have been *prior* to the execution, once the DPR Arbitration Agreement was signed on August 23, 2003 and January 30, 2004 by UPW and Dawson, respectively, there plainly was a meeting of the minds manifested by the instrument. The DPR Arbitration Agreement constituted an express manifestation of the parties' "agreement to arbitrate" under its terms. *See Earl M. Jorgensen Co. v. Mark Constr., Inc.,* 56 Haw. 466, 470, 540 P.2d 978, 982 (1975) ("The existent of mutual asset or intent to accept is determined by an *objective standard.* A party's words or acts are judged under a standard of reasonableness in determining whether he [or she] has *manifested an objective intention to agree.*" (Emphases added.)). On its face, the DPR Arbitration Agreement is objective evidence of an "agreement to arbitrate" governed, as "agree[d] by the parties," by the "[DPR Arbitration Rules], as established by DPR."

Further, the agreement is "definite and unambiguous," *i.e.,* by its explicit language, the parties "have agreed to conduct a binding arbitration proceeding" and to "abide by the DPR Arbitration Rules." *See State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.,* 90 Hawai'i 315, 324, 978 P.2d 753, 762 (1999) (citation omitted). "The court should look no further than the four corners of the document to determine whether an ambiguity exists." *Id.* (citation omitted). The DPR Arbitration Agreement contains no terms that "are reasonably susceptible to more than one meaning." *Airgo, Inc. v. Horizon Cargo Transport Inc.,* 66 Haw. 590, 594, 670 P.2d 1277, 1280 (1983) ("A contract is ambiguous when the terms of the contract are

reasonably susceptible to more than one meaning." (Citations omitted.)).

Hence, "[i]t is well settled that courts should not draw inferences from a contract regarding the parties' intent when the contract is definite and unambiguous[,]" *State Farm Fire & Cas. Co.* 90 Hawai'i at 324, 978 P.2d at 762 (citing *Hanagami v. China Airlines, Ltd.,* 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984)), as it is here. The parties' "disagreement as to the meaning of a contract or its terms does not render clear language unambiguous." *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Fermahin,* 73 Haw. 552, 556, 836 P.2d 1074, 1077 (1992); *Hawaiian Ins. & Guar. Co. v. Chief Clerk of the First Circuit Court,* 68 Haw. 336, 342, 713 P.2d 427, 431 (1986)).

## III.

The majority relies on UPW's January 27, 2004 letter to the DPR in concluding that "it cannot reasonably be said that Dawson manifested an objective intention to agree that the DPR Arbitration Agreement constituted a *new* agreement to arbitrate." Majority op. at 510 (internal quotation marks and citation omitted) (emphasis in original). As noted above, in order to prevent the DPR from cancelling the scheduled arbitration hearings, UPW's counsel sent the DPR a letter in which UPW agreed to advance Dawson's share of anticipated arbitration fees. Despite its conclusion, the majority does not indicate how the January 27, 2004 letter, *written by UPW to the DPR,* could manifest *Dawson's intent* at the time Dawson executed the DPR Arbitration Agreement on January 30, 2004.

The majority's contention that the January 27, 2004 letter demonstrates that UPW "did not consider the DPR Arbitration Agreement as a new agreement to arbitrate that would displace the dispute resolution provisions" of the Plan Agreement, majority op. at 510, is incorrect inasmuch as any negotiations were integrated into the subsequently executed DPR Arbitration Agreement, and consideration of the January 27, 2004 letter was barred by the parol evidence rule. *See* discussion *infra.*

Moreover, the DPR Arbitration Agreement, as discussed *supra*, constitutes an "agreement to arbitrate" according to HRS § 658A–3(a) or a "record" of such an agreement under HRS § 658A–3(b), as discussed *infra*, for as the majority itself acknowledges, "[t]he dispute resolution provisions of the Plan Agreement ... *do not specify or make reference to the law that would govern an arbitration proceeding pursuant to the Plan Agreement.*" Majority op. at 511 (emphasis added). Unlike the Plan Agreement, the DPR Arbitration Agreement specified the law that would apply, *i.e.*, that HRS chapter 658A would apply. *See* discussion *infra*. Accordingly, the DPR Arbitration Agreement did not "merely memorialize[ ] ... the selection of an arbitrator as required by section 5.03 of the Plan Agreement," as the majority asserts, majority op. at 510, but specified the law that would govern the arbitration, *i.e.*, HRS chapter 568A—a *condition absent from the Plan Agreement.*

This court has explained that "[i]t is ... well settled that the parol evidence rule is invoked to bar the testimony of prior contemporaneous negotiations and agreements that vary or alter the terms of a written instrument." *State Farm Fire & Cas. Co.*, 90 Hawai'i at 324, 978 P.2d at 762 (citations omitted). The parol evidence rule "is one of substantive law setting forth the well-settled principle that an agreement reduced to writing serves to *integrate all prior agreements and negotiations* concerning the transaction into the written instrument which then represents the final and complete agreement of the parties." *Id.* (emphasis added) (citations omitted).

Subsequent to the January 27, 2004 letter, the DPR Arbitration Agreement was signed by both parties. This court has instructed that "*[a]s a rule of substantive law, [the parol evidence rule] determines the parties' legally enforceable contractual obligations and precludes consideration of extrinsic evidence to the contrary[,]*" such as UPW's January 27, 2004 letter. *Id.* (citations omitted) (emphasis in original). The DPR Arbitration Agreement was thus "an agreement reduced to writing [that] serve[d] to integrate all prior agreements and negotiations [including the January 27, 2004 letter and] which then represent[ed] the *final and complete agreement* of the parties." *Id.* (emphasis added) (citations omitted).[3] Objectively viewed, a written instrument titled "agreement" and signed by both parties to the instrument is the sine qua non of the agreement of the parties involved.[4]

## IV.

HRS § 658A–3(a) states, "Except as provided in subsection (c), *this chapter governs an agreement to arbitrate made on or after July 1, 2002.*" As noted before, the DPR Arbitration Agreement is an "agreement to arbitrate." It became the final agreement of the parties when Dawson executed the agreement on January 30, 2004. Hence, it was made after July 1, 2002. Pursuant to the plain language of HRS § 658A–3(a) then, HRS chapter 658A "governs [because it applies to] an agreement to arbitrate made ... after July 1, 2002."

When confronted with issues of statutory interpretation, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Honda v. Bd. of Trs. of the Employees' Ret. Sys. of the State*, 108 Ha-

---

**3.** As noted above, the DPR Arbitration Agreement states in pertinent part, "*By agreement of the parties set forth below,* [DPR]/James Paul, Esq. have agreed to conduct a binding arbitration proceeding of the matters in controversy between the parties .... *The parties, DPR, and James Paul, Esq. agree to follow and abide by the DPR Arbitration Rules, Procedures & Protocols, as established by the DPR.*" Obviously, the language of the DPR Arbitration Agreement establishes that the parties agreed to a "binding arbitration

proceeding" as "set forth" in the DPR Arbitration Agreement.

**4.** Therefore, the majority's contention is incorrect insofar as it asserts that "the critical question" is "erroneously ignored" as to whether the DPR Arbitration Agreement constitutes a new valid and enforceable agreement to arbitrate[.]" Majority op. at 512 n. 19. As discussed above, under an objective standard, the DPR Arbitration Agreement is plainly an "agreement to arbitrate" under HRS chapter 658A.

wai'i 212, 233, 118 P.3d 1155, 1176 (2005) (internal quotation marks and citation omitted). As we have stated, "[f]ollowing our well-settled approach to statutory interpretation, we look first to the plain language of the statute." *Id.* at 233, 118 P.3d at 1174 (citing *Zanakis–Pico v. Cutter Dodge, Inc.*, 98 Hawai'i 309, 316, 47 P.3d 1222, 1229 (2002)). Adhering to the plain language of HRS § 658A–3(a), the DPR Arbitration Agreement was made after July 1, 2002, and thus, HRS § 658A–3(a) applies.

### V.

Assuming *arguendo* that the Plan Agreement was the "agreement to arbitrate" and the DPR Arbitration Agreement is not an "agreement to arbitrate," but instead a "record," HRS chapter 658A still governs. HRS § 658A–3(b) states in pertinent part that *"[HRS chapter 658A] governs an agreement to arbitrate made before July 1, 2002, if all the parties* to the agreement or to the arbitration proceeding *so agree in a record."* (Emphases added.) A "record" is defined as "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." HRS § 658A–1 (Supp.2005). The DPR Arbitration Agreement is a "record" because it contains "information that is inscribed on a tangible medium." *Id.*

Based on the manifest wording of the January 30, 2004 DPR Arbitration Agreement, the parties "agree[d] to follow and abide by the DPR Arbitration Rules, Procedures &

Protocols, as established by DPR." By "agree[ing] to follow and abide by the DPR Arbitration Rules," the parties unambiguously incorporated by reference the DPR Arbitration Rules into the DPR Arbitration Agreement.

In turn, the DPR Arbitration Rules specifically reference HRS chapter 658A. Rule 31 of the DPR Arbitration Rules entitled "Change of Award by the Arbitrator(s)," states that "Parties may apply to the Arbitrator(s) to modify, correct or clarify the Award, *pursuant to the procedures specified in the [Revised Uniform Arbitration Act, HRS chapter 658A], Section 20."* [5] (Emphasis added.) The requirement of a record aside, because the parties agreed to "follow and abide by the DPR Arbitration Rules," the procedures regarding "Change of award by arbitrator" specified in HRS § 658A–20 arguably apply irrespective of the effective dates of HRS chapter 658 or HRS chapter 658A.

The DPR Arbitration Rules also include Rule 35 entitled "Application of DPR Rules," which states in pertinent part that "[the DPR Arbitration Rules] shall be interpreted and applied in *conformity with the applicable arbitration law."* (Emphasis added.) When the "record" in the form of the DPR Arbitration Agreement was made on January 30, 2004, the applicable arbitration law was HRS chapter 658A.

In adopting the DPR Arbitration Rules, which included DPR Arbitration Rule 31 and DPR Arbitration Rule 35, the parties mani-

---

**5.** HRS § 658A–20 (Supp.2005) entitled "Change of award by arbitrator," provides in relevant part:

 (a) On motion to an arbitrator by a party to an arbitration proceeding, *the arbitrator may modify or correct an award:*

 (1) *Upon a ground stated in section 658A–24(a)(1) or (3);*

 (2) Because the arbitrator has not made a final and definite award upon a claim submitted by the parties to the arbitration proceeding; or

 (3) To clarify the award.

 . . . .

 (d) If a motion to the court is pending under section 658A–22, 658A–23, or 658A–24, *the court may submit the claim to the arbitrator to consider whether to modify or correct the award:*

 (1) *Upon a ground stated in section 658A–24(a)(1) or (3);*

 (2) *Because the arbitrator has not made a final and definite award upon a claim submitted by the parties to the arbitration proceeding;* or

 (3) *To clarify the award.*

(Emphases added.) HRS § 658A–24(a)(1) (Supp.2005) provides in relevant part:

 (a) Upon motion made within ninety days after the movant receives notice of the award pursuant to section 658A–19 or within ninety days after the movant receives notice of a modified or corrected award pursuant to section 658A–20, *the court shall modify or correct the award if:*

 (1) *There was an evident mathematical miscalculation* or an evident mistake in the description of a person, thing, or property referred to in the award[.]

(Emphases added.)

fested their consent that the procedures set forth in HRS chapter 658A controlled changes made to an award by the arbitrator. Thus, the DPR Arbitration Agreement constitutes a "record" of an agreement by "all the parties to the agreement or to the arbitration proceeding" that HRS chapter 658A regulates the "agreement to arbitrate." [6] HRS § 658A–3(b).

## VI.

HRS § 658A–3(c), then, is not applicable. Because HRS chapter 658A applies by virtue of HRS § 658A–3(a) or (b), an analysis under HRS § 658A–3(c) regarding the applicability of HRS chapter 658A is not germane.

## VII.

Inasmuch as HRS chapter 658A governs, HRS § 658A–20 applies. The majority does

not dispute that HRS § 658A–20 expressly allows a party to request the arbitrator to correct evident mathematical miscalculations in an arbitration award or to clarify the arbitration award. Majority op. at 501–02. The court's remand to the arbitrator was on that basis. Accordingly, I would affirm the court's January 6, 2005 final judgment confirming an amended arbitration award in favor of UPW.

---

6. Indeed, the majority concedes that if "the DPR Arbitration Agreement constitutes a new valid and enforceable agreement to arbitrate, ... [it] supersed[es] the dispute resolution provisions in the Plan Agreement, and *trigger[s] the application of HRS chapter 658A*." Majority op. at 512 n. 19 (emphasis added).